ANN GRANT, appellee, v. YOUNKER BROTHERS, INC., et al., appellants.

No. 48312.

(Reported in 58 N.W.2d 834)

June 9, 1953.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, for appellants.

Ralph N. Lynch, of Des Moines, for appellee.

Mulroney, J.—Plaintiff, Ann Grant, sued Younker Brothers, Inc., operator of a department store in Des Moines, Iowa, and the Francois Salons of Iowa, Inc., which latter corporation has something to do with operating a beauty parlor in Younker's store. The petition alleged that on September 26, 1950, plaintiff

went to defendants' beauty shop in Younker's department store for a permanent wave for her hair and an employee waited upon her and applied some lotion to plaintiff's hair and scalp. The petition goes on to allege: "After said solution had been applied to plaintiff's hair, defendants' agent placed her under an electric drier on two occasions without any protection for her forehead, face or neck. As a result of said treatment plaintiff's face became inflamed, the coverings of her eyes were inflamed, the lining of her nose was inflamed, and she suffered and will suffer great mental and physical pain and anguish and humiliation on account of her injuries and disfigured condition." The petition sought recovery of plaintiff's damages, alleged to be in the sum of $10,000, upon the doctrine of res ipsa loquitur, paragraph 6 of the petition stating: "The sole and proximate cause of plaintiff's injuries and damages was the negligence of defendants and their employees and agents, who were in sole control of the instrumentalities which caused and effected plaintiff's injuries and damages in that they carelessly and negligently caused the injuries and damages hereinbefore stated."

In the first trial the jury disagreed and in the second trial plaintiff recovered judgment for $2000, from which the defendants appeal. But the appeal is limited to a review of the trial court's rulings, refusing to sustain defendants' motion for directed verdict made at the close of plaintiff's evidence, and renewed at the close of all of the evidence, and refusing to sustain defendants' motion for judgment notwithstanding verdict. The parties stipulated both defendants would be liable if plaintiff were entitled to any recovery. The only question then is whether the evidence, viewed in the light most favorable to plaintiff, was sufficient to warrant submission of the case to the jury. Defendants are not seeking a new trial. They argue many alleged errors committed in the trial but we are not concerned with alleged errors which, if true, would only entitle the defendants to a retrial. The question is whether there was sufficient evidence, properly admitted, entitling plaintiff to go to the jury under the doctrine of res ipsa loquitur.

Plaintiff, about forty-three years old, was a dress buyer and saleslady for another Des Moines store. She testified she went

to defendants' shop on the morning of. September 26, 1950, to have a permanent. She said Miss Zenda Meyers who waited on her told her she was going to give her a Helene Curtis Duchess Cold Wave. Plaintiff related what occurred as follows:

"After she shampooed my hair she put me under the drier and dried my hair. She did not give me the electric control on this drier at that time. After my hair was dried, she marked it off· and rolled it up on plastic curlers, then she put on the solution and rolled it up; then she put a cap on my head. She did not put any cotton around my hairline or the back of my head, or over my ears. ·

"I sat there for about five or ten minutes and she came over and looked at my hair and she took me and put me under the drier, and I would say she left me under the drier for about five to seven minutes. That was while the solution and cap was on my head. Q. And did she give you anything to hold in your hand while you were under the drier when this solution was on your hair? A. No, sir. Q. Well, did she give you a· towel at any time? A. Yes, she gave me a towel. Q. So that you did have a towel in your hand? A. That's right. Q. Did she give you the electric control of the drier at the time? A. No, sir.

"She had never placed me under a drier before when the solution was on my hair. When she gave me the towel she said if the solution run down on my face to take the towel and wipe it off. Some of it ran down on my face and I did as she instructed. I was under the drier five to seven minutes. Then she took me from under the drier and put a little more lotion on and put me under the drier again. She did not put the electric control of the drier in my hand. She was right there at the time. She left me under the drier from three to five minutes. She gave me a towel again and I used it. The fluid was running down on my face from my hair.

"I asked her: 'Miss Zenda, how come you put me under the drier twice? You have never put me under the drier before when you have given me a Cold Wave.' She said: 'Well, I have to because you don't have enough heat in your body for it to take.'

"Then she took me out from under the drier, took off the cap and the rods and took me over and rinsed out my hair. Then she combed my hair and set it and put a net over it and placed me in another room under a drier. She put the electric control of the drier in my hand. She did not give me a towel this time. I was under the drier from 11:30 until a quarter of 1."

Plaintiff left the beauty shop around 1 p.m. and went to the store where she worked. She testified: "* * * about 3:30 or 4 o'clock my face became very, very red and burning. My neck was just like a piece of seared meat. My forehead was all red. I went to Younker's and asked for Miss Coomes [the shop manager]. She wasn't in so they called Mr. Lombardo and he came out and said: 'Oh, my, I will get some unguentine and give it to you to put on.' I said: 'Oh, I don't believe I want to put unguentine on my face.' So then a lady from their beauty salon came over and she said: 'Oh, Miss Grant, what has happened? And I said: 'I don't know, but I believe I had been badly burned. My neck here is all red and my face is all red.' She took me over to the beauty bar and got some lotion and said: 'Oh, let's get some of this on there.' So she put some on the back of my neck and it smarted, so I said: 'I don't know whether I can stand it or not.' And she said: 'Yes, you put that on because it will help it.' So I put it on. She gave me a small bottle to take with me. The next morning I made a buying trip to Chicago. When I returned my face was burning me. I called Miss Coomes. She said: 'I have heard about it. What do you want us to do?' She made an appointment for me with Dr. Noun for Saturday morning. I went to Dr. Noun. He examined me and prescribed for me. * * * I went back to Dr. Noun's office on October 23. I had the prescription filled at the Denny Brann Drugstore and Miss Coomes paid for it. It was $2.95. I followed the directions Dr. Noun gave. I went back on later occasions and he gave me further prescriptions and directions."

Plaintiff consulted a number of doctors and she was examined by others at the request of defendants. She described at length the reddening and rash and the irritation to her eyes and nose that continued up to the time of trial. She testified

that prior to September 26, 1950, she had never had any trouble with her skin or irritation of her nose from any cold wave. Plaintiff's employer, Mr. Bernstein, who had seen her nearly every day for five years stated: "Prior to September 26, 1950, I thought she had a very nice complexion, and since that time I notice reddening and the burnt-like look. * * * It hasn't improved much. I haven't noticed much change since then. It is the same now as it was then. Yes, blistering and things."

Several other witnesses who had known plaintiff and saw her often testified she had a good complexion prior to September 26, 1950, and after that date the redness, irritation and swelling around the eyes were easily noticeable.

Plaintiff bought a bottle of Helene Curtis Duchess Creme Oil Wave, Regular and turned it over to Professor J. Earle Galloway, professor of pharmacology and toxicology at Drake University, for analysis. Much of plaintiff's testimony consisted of the professor's analysis of this product that he examined. It contains ammonium thioglycolate which produces a semisoluble effect upon the hair and when it comes in contact with the skin it has a tendency to produce irritation and inflammation, though the professor said the extent would vary depending upon the degree of sensitiveness of the skin of the individual. The professor said heat would precipitate and increase the action of the chemicals on the skin.

A beauty shop operator in the city of Des Moines, a licensed cosmetologist, testified for plaintiff saying he had given many Helene Curtis Cold Waves. He said the ordinary skillful cosmetologist in Des Moines would not give a cold wave to a client who had small pimples or abrasions on her scalp. He said he used cotton around the edge of the cap to protect the face so the solution would not go down on the face and neck and it was his opinion that a cosmetologist with the ordinary skill and care would not put a client receiving a cold wave under a heater or drier when the client had the cold-wave solution on her hair. In connection with his testimony there was introduced the slip of paper, Exhibit A, found in the Helene Curtis cartons, containing the manufacturer's instructions to the operator. These instructions say nothing about using heat when the solution is

on the hair. They tell the operator, in italics, to "wear rubber gloves to avoid continued contact with solution", and they instruct the operator to moisten the hair strands with the solution one-half inch from the scalp.

Two of the doctors who had examined the plaintiff said she had contact dermatitis. Dr. Watters said the inciting cause was some "chemical or something" and if it would come on immediately following an application of the cold wave one "would naturally think that was the thing that produced it."

Miss Loretta Coomes, the manager of defendants' shop and a licensed, practicing cosmetologist for twenty-three years was called to the stand by the plaintiff and asked the following question and she gave the following answer: "Q. And, Miss Coomes, would a licensed cosmetologist here in Des Moines on September 26, 1950, using the ordinary skill and care of a licensed cosmetologist here in that vicinity at that time, ordinarily cause any injury to a client in giving a cold wave? A. No, sir."

There was other testimony introduced in plaintiff's main case and a good deal of talk by the doctors about allergy but the foregoing is a fair summation of the most favorable testimony for plaintiff as the record stood when plaintiff rested.

I. In Pearson v. Butts, 224 Iowa 376, 380, 276 N.W. 65, 67, the plaintiff received burns from a beauty-parlor treatment. We allowed recovery under the doctrine of res ipsa loquitur, the opinion stating: "In this case, the plaintiff was well and simply called upon the beauty expert to receive a shampoo and a permanent hair curl. In performing this work, all the instrumentalities used in connection therewith were under the control of the defendant's operator, and if the evidence tends to show that in the exercise of ordinary care the injuries complained of would not ordinarily follow, the doctrine of res ipsa loquitur would apply."

The above opinion cites authorities from other jurisdictions and quotes similar statements from opinions where beauty-shop patrons were allowed recovery for injuries suffered in beauty treatments, under the rule of res ipsa loquitur. As stated in Chauvin v. Krupin, 4 Cal. App.2d 322, 40 P.2d 904, 905, cited

and quoted from in the Pearson case (page 381): " 'It is a case in which the application of the res ipsa loquitur doctrine is eminently just and proper.' "

In addition to the authorities cited in the Pearson case, the rule that the doctrine of res ipsa loquitur is applicable to a patron's action against a beauty parlor to recover for damages sustained in the treatment, where the instrumentalities were under the control of the operator and the injury was such as would not ordinarily occur, is supported by the authorities cited in the exhaustive note in 14 A. L. R.2d 860, pages 877 to 881.

It must be conceded that, granting the sufficiency of the evidence of causation between the treatment and the injury, a prima-facie case for recovery under res ipsa loquitur was presented. Defendants make some argument that the instrumentalities were not under their control for the plaintiff knew of the shutoff switch on the drier and she could have shut it off or removed herself from the drier. There is no merit in this argument. Plaintiff was experiencing no pain while undergoing the treatment. She was following the operator's orders. The operator testified: "The control is located—this one did hang down from the cord, all you have to do is to reach in from behind and take it. However, it wasn't necessary for her to have a control that time. If I want the heat on for three minutes, I don't want the customer to turn it off."

II. Defendants' main argument is that the evidence was insufficient to warrant submission to the jury the question of causal connection between the beauty treatment given and the irritation and rash that developed on plaintiff's face and neck. We think plaintiff's evidence was sufficient on this issue to make out a prima-facie case. Professor Galloway testified the product was a hair solvent and that it would have a tendency to irritate the skin if it did come in contact with the skin, and heat would precipitate and increase the action of the chemical on the skin. Plaintiff testified the product did run down on her skin. The rash and irritation appeared within a few hours after the treatment. Doctor Fagan testified the contact of the product with the skin might have been the active producing cause of the rash he observed on plaintiff. And Doctor Watters said plaintiff had contact dermatitis "caused by some chemical or allergy—produc-

ing an allergy of some kind or irritation." When asked his opinion as to whether the cold-wave fluid might have been an active producing cause he said: "Well, there is some chemical in there. We know that. * * * Well, if it would come on immediately following an application of something you would naturally think that was the thing that produced it." He then was asked the direct question if he would think that the cold wave was what caused plaintiff's condition and he replied that he would.

In Reed v. Rosenthal, 129 Or. 203, 209, 276 P. 684, 686, 63 A. L. R. 1071, the plaintiff suffered blood poisoning after a facial treatment in defendant's beauty parlor. In her suit it was urged her doctor did not say her condition was "probably" caused by the treatment. The opinion holds in effect the doctor's testimony supplemented the plaintiff's testimony, but the testimony of an expert was not necessary and "the testimony of the plaintiff was sufficient to take the case to the jury."

Smith v. Artiste Permanent Wave Shoppe, 293 Mich. 441, 444, 292 N.W. 361, 363, is much in point as shown by the following quotation:

"Plaintiff's testimony that a solution being applied to her hair in pads drained down upon and burned her ear and back thereof and, after the wrapping on her hair was removed, she looked at her hair and saw the ends 'looked sort of frizzed up and lighter', and she ran her hand through her hair, opened her fingers and hair came away; that discoloration, followed by bleeding and scabs with pus and eczema, which she had never had before, presented a case of negligent treatment for consideration by the jury. * * *

"It is contended by defendant that eczema can be caused by many things and the jury had to speculate in holding it was caused, in this instance, by act of defendant.

"Plaintiff did not have to negative all possible causes of eczema in order for the jury to find the particular cause in this instance."

See also Cornbrooks v. Terminal Barber Shops, 282 N. Y. 217, 26 N.E.2d 25; Gavin v. Kluge, 275 Mass. 372, 176 N.E. 193; 7 Am. Jur., Barbers and Beauty Specialists, section 15.

■ III. Defendants argue all of the evidence as to what the liquid cold wave contained was incompetent for it was all based on the product analyzed by Professor Galloway and there is no showing this was the same or similar to the product used upon plaintiff. Defendants in their answer pleaded that plaintiff was given a Helene Curtis Cold Wave. Plaintiff testified the operator said she was going to give her a Helene Curtis Duchess Cold Wave. The product the professor analyzed was Helene Curtis Duchess Cold Wave. This was a sufficient prima-facie showing and it is significant that defendant offered no evidence of any other cold-wave solution used on plaintiff and in fact their operator later testified she gave plaintiff a Helene Curtis Duchess Cold Wave. The evidence of the professor's analysis of the product turned over to him and all of the evidence based thereon was clearly admissible.

IV. Defendants argue the plaintiff's medical testimony shows she was suffering from "allergic contact dermatitis." In other words, she is suffering from a dermatitis (inflammation of the skin) caused by contact with something to which she is allergic. Defendants point to the evidence of the doctors that most everyone is allergic to something and that a patch test could have been made to determine whether plaintiff was allergic to the product used. The argument is that since no patch test was made plaintiff failed to show the product caused her condition. It is true the doctors said one could not tell definitely whether a certain skin would be sensitive to a substance that came in contact with the skin until a patch test was made but both of the doctors diagnosed plaintiff's condition as "contact dermatitis" that might have been caused by the lotion and Doctor Watters was able to say, when the dermatitis appeared so soon after the cold wave, he would naturally think that was what produced it. This was a hair lotion and there is nothing to indicate it was intended for application to the skin. Indeed the directions tell the operators to put it on the hair one-half inch from the scalp and warn them, in italics, to wear rubber gloves to avoid continued skin contact. The patch test the doctors talked about involved putting a substance on the skin and leaving it there for twenty-four hours. If it caused a reddening or irritation the person would be said to be allergic to the substance.

968

The manufacturer's warning to the operators indicates the reaction from a patch test might be rather general.

V. Defendants argue that their evidence conclusively rebutted any inference of negligence which might arise from plaintiff's evidence and at the close of all the evidence the trial court should have directed the verdict for defendants. In some respects plaintiff's cause was strengthened by defendants' testimony. The operator admitted that in the previous trial she had testified plaintiff had small abrasions on her scalp. In the second trial she said she should not have used the word "abrasions" for these were closed sores. At any rate another instruction sheet to operators was introduced (Exhibit M) in much the same language as Exhibit A, previously mentioned, but this one contained the additional instruction "[if] you note any sores or abrasions, the permanent should not be given." Defendants argue this instruction sheet, which plaintiff's counsel stated in open court he removed from another exhibit, to wit, the Helene Curtis carton, was not admissible. It is enough to state the operator made it admissible. She said she had read what was contained in Exhibit M prior to September 26, 1950. The operator also testified that she put plaintiff under the drier with wave lotion on her hair but she did not frequently put customers under the drier when they had Helene Curtis Cold Wave lotion on their hair. She said: "It has been very seldom."

About all that can be said for defendants' medical testimony is that it created a conflict in the expert testimony. Defendants' doctors stated plaintiff was suffering from rosacea which is. lighted up or brought about by a nervous condition or at least not developed by any contact. One of defendants' doctors said if plaintiff's condition were due to the cold wave it would be contact dermatitis, but he said she had rosacea.

The cosmetologists who testified for defendants said it was not an unusual procedure to put a patron under the drier with wave lotion on her hair. In this their evidence was in conflict with the testimony of plaintiff's cosmetologist, Mr. Dailey, and somewhat in conflict with defendants' operator who said she gave forty or fifty cold waves a month and "very seldom" put anyone with lotion on her hair under a drier. As stated, the instructions to the operators do not suggest this practice.

We hold the defendants' evidence does not rebut the possible inference of negligence as a matter of law. As bearing thereon see Young v. Marlas, 243 Iowa 367, 51 N.W.2d 443.

Upon the whole record we find evidence upon which the jury could with reason find a causal connection between the treatment and the injury that developed so soon after it was administered. And upon the whole record the jury could have found the injury was not merely an allergy peculiar to the plaintiff to the product used—the one woman in a thousand who might be allergic to the product in contrast to the normal individual. Plaintiff had had three Helene Curtis Cold Waves prior to September 26, 1950, without such disastrous results. Under the whole record the negligence of the operator was a fair inference. This is enough to support the verdict. The judgment is affirmed.—Affirmed.

All JUSTICES concur.