STATE of Iowa, Appellee,

v.

Bryan Kirby BARRETT, Appellant.

No. 85–967.

Supreme Court of Iowa.

Feb. 18, 1987.

Paul Papak, Iowa City, and J.W. Conway and Marie Prince-Cohen, of Conway & Prince-Cohen, Muscatine, for appellant.

Thomas J. Miller, Atty. Gen., and James W. Ramey, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and McGIVERIN, LARSON, CARTER, and WOLLE, JJ.

CARTER, Justice.

Defendant, Bryan Kirby Barrett, appeals his conviction of two counts of murder in the first degree in violation of Iowa Code sections 707.1 and 707.2 (1985). He contends the district court erred in admitting, over his timely objections and motions to suppress, entries which he had made in personal journals. He also contends the district court erred in allowing expert testimony concerning the results of tests performed on certain physical evidence in the case. Because we find that the contents of one of the personal journals should have been excluded and the improperly admitted evidence was prejudicial to defendant, we reverse the judgments of conviction.

Early in the morning of February 23, 1979, the bodies of two women were discovered at different locations several miles apart in a rural area south of Muscatine. The first body found was that of nineteen-year-old Cynthia Kay Walker who had been shot three times and was lying in the middle of a gravel road. The second body was that of twenty-one-year-old Carol Ann Willits. It was discovered seated behind the wheel of an automobile parked on a blacktop road with lights on and motor running. Carol Ann Willits had been shot once through the right temple.

Found in the car near Willits's body was a note in her handwriting addressed to defendant, which stated in part, "I'm sorry I've caused you so much trouble" and "I hope you find your peace/I found mine." The letter concluded, "Love and good-bye." Also found in the car was a three-page letter addressed to Willits from defendant advising her that her romantic feelings for him were not reciprocated. The letter was in an envelope addressed to Willits which had been postmarked in the Muscatine, Iowa, post office. Next to the letter, on the floor of the car, was a torn valentine in an envelope addressed to defendant from Cynthia Kay Walker. Strands of Walker's hair were also found in the automobile.

Defendant was not formally charged with these crimes until November 1984. The theory of the State's case against him is that he murdered Walker in order to obtain the proceeds of a life insurance policy in which she was the insured and he was the named beneficiary. This theory is premised upon defendant also killing Willits and laying false clues to suggest that she had murdered Walker and then committed suicide.

During the trial, the court received in evidence over defendant's timely objections and motions to suppress the contents of two personal journals kept by him. One of these covered the months of April through July 1977. Its handwritten, dated entries, consisting of 143 pages, relate defendant's feelings about his then wife and their pending divorce and child custody dispute.

These entries describe various plans and schemes to cause harm or death to defendant's wife and several persons believed to be taking her side in the child custody dispute. This journal at one point suggests that a possible reason for defendant killing his wife is "profit." Other reasons are also mentioned. The journal also contains suggestions for causing injury to total strangers, not involved in the affairs of defendant or his wife, so that authorities would believe that a serial assailant was involved. At the time this journal was written, defendant had not met either Walker or Willits.

Life insurance is not mentioned in the journal, but the State offered evidence that, two months prior to the first dated entry, defendant had forged his wife's signature on an application for life insurance and obtained a policy in which he was the named beneficiary. Defendant and his wife were divorced in August 1977. The life insurance was kept in force until that time, and his wife was not made aware of its existence until the investigation of the death of Cynthia Walker.

The second journal, which is not dated, is also in defendant's handwriting.[1] In his trial testimony, defendant indicated this journal was written by him in the fall of 1984. It contains no reference to either Walker or Willits or the circumstances surrounding their deaths. It contains a draft of a note from defendant to his parents with respect to his contemplated suicide. It also contains a draft of a ransom note for the kidnapping of some unidentified woman. Further, it describes plans for the kidnapping and murder of a Des Moines Register paper carrier. These plans include planting false clues for the authorities indicating the crime was committed by some unidentified person other than defendant. They suggest that it is defendant's intention to convince authorities that this person committed the crime in order that defendant might collect a reward.

After deliberating approximately five days, the jury found defendant guilty of murder in the first degree in the deaths of both Walker and Willits. This appeal is from the judgment and sentence entered on that verdict. Other facts bearing upon the issues will be discussed in connection with the legal contentions presented.

I. *Admissibility of Evidence of Other Planned Wrongful Acts.*

Defendant's first contention is that the district court erred in admitting the contents of the two personal journals over his timely objections and motions to suppress. He bases his argument on the provisions of Iowa Rules of Evidence 403 and 404. He urges the only conceivable function of this evidence was to present a generalized self-portrait of his character for purposes of establishing that he acted in conformity with that character in perpetrating the crimes with which he was charged. This, he suggests, is not permitted under Iowa Rule of Evidence 404. In addition, he argues that even if the evidence is determined to have some relevancy to the issues on trial its probative value is substantially outweighed by the danger of unfair prejudice. This circumstance, he urges, requires exclusion of the evidence under Iowa Rule of Evidence 403.

The State responds to these contentions by urging that the challenged evidence was relevant and admissible in order to establish facts in issue which tend to link defendant with the crimes. The nature of the State's contentions in this regard is discussed more fully later in this opinion.

Iowa Rule of Evidence 404 provides:

(a) *Character evidence generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character of-

---

**1.** Although defendant throughout his brief suggests that this journal contains fourteen pages, we count only thirteen. Six of the thirteen pages have been reproduced by electrostatic detection apparatus.

fered by an accused, or by the prosecution to rebut the same;

(2) *Character of victim.*

(A) *In criminal cases.* Subject to Iowa R.Evid. 412, evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in any case where the victim is unavailable to testify due to death or physical or mental incapacity to rebut evidence that the victim was the first aggressor;

(B) *In civil cases.* Evidence of character for violence of the victim of assaultive conduct offered on the issue of self defense by a party accused of the assaultive conduct, or evidence of peaceable character to rebut the same;

(3) *Character of witness.* Evidence of the character of a witness, as provided in Iowa R.Evid. 607, 608, and 609.

(b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Both the defendant and the State refer to subsection (b) of rule 404 as an exclusionary rule vis-a-vis evidence of other crimes or wrongful acts. We have so described it in our decisions. *E.g., State v. Emerson,* 375 N.W.2d 256, 260 (Iowa 1985). Subsection (b), we believe, purports to exemplify how subsection (a) of the same rule applies to evidence of specific acts tending to show bad character.

■ The language of the first paragraph of rule 404(a) suggests that its exclusionary ambit includes situations where the proponent of the evidence tenders it with the avowed purpose of establishing propensity based on character. We believe, however, that the exclusionary force of the rule applies equally to instances where the proponent offers the evidence for another avowed purpose, but the court determines that in fact its only relevancy is to illustrate the character of the accused for purposes of establishing other actions in conformity with that character.

A specific rule is required in order to exclude such evidence because it otherwise qualifies for admission under general relevancy standards. As explained in *United States v. Fosher,* 568 F.2d 207 (1st Cir. 1978),

[t]he inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*Id.* at 212 (quoting *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168, 174 (1948) (footnote omitted)).

■ The primary thrust of subsection (b) of rule 404 is to illustrate some but not all situations in which evidence relevant to establish some legitimate issue in the case is not rendered inadmissible because it also reveals character or traits of character otherwise precluded by subsection (a) of the rule. In applying rule 404, our primary task continues to be the determination of whether the challenged evidence is relevant and material to some legitimate issue other than a general propensity to commit wrongful acts. *Emerson,* 375 N.W.2d at 260; *State v. Gibb,* 303 N.W.2d 673, 682 (Iowa 1981); *State v. McDaniel,* 265 N.W.2d 917, 921 (Iowa 1978). If it is relevant and material for this purpose, it is prima facie admissible, notwithstanding its tendency to demonstrate the accused's bad character.[2]

---

**2.** This prima facie admissibility may be defeated, however, if under the balancing test of rule 403 the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *State v. Cott,* 283 N.W.2d 324, 329 (Iowa 1979); *see Fosher,* 568 F.2d at 213; *United States v. Barrett,* 539 F.2d 244, 248 (1st Cir. 1976); *United States v. Cepulonis,* 530 F.2d 238,

In the district court, both the defendant and the State approached the issues as if contemplated wrongful acts which are not carried out constitute the type of "wrongs" embraced by rule 404(b). The trial court entertained some doubt in this regard. We need not decide whether this is always the case. Limiting our inquiry to the type of conduct described in defendant's journals, we find that any suggestion that the described acts be committed carries nearly as much potential for causing an unwarranted propensity inference as would the completed acts. We therefore view the journals in this light in determining the exclusionary force of rule 404(a).

█ In considering the contents of defendant's journals, the trial court concluded that each had probative value regarding factual issues in the case apart from character propensities attributable to prior wrongful acts. We agree with that conclusion concerning the dated, 143–page journal. The entries it contains, when considered in conjunction with other evidence in the case, are relevant as tending to dispel an innocent purpose for defendant's actions in obtaining insurance on Walker's life.

Defendant's statements to authorities indicated that he arranged for this insurance through the same agent who had written the life insurance on his former wife. He indicated he induced Walker to sign the application by suggesting that, if the two of them took a planned trip to California and she were somehow killed, her parents might sue him. He apparently convinced her the insurance was to protect him against this risk. Defendant continued to assert at the time of trial that this was his purpose in buying the insurance.

A case with some factual similarity to the present situation is *United States v. Engleman*, 648 F.2d 473 (8th Cir.1981). There, the defendant Engleman was charged with mail fraud for allegedly insuring the life of one Peter Halm and then murdering him. The government's theory was that Engleman was acting in concert with Halm's wife for a share of the insurance proceeds payable to her. The court approved the admission of evidence, over objection, that thirteen years before Halm's death Engleman had murdered one Eric Frey and split the proceeds of the insurance on the victim's life with Frey's widow. This evidence was found to be admissible for purposes of showing a fraudulent intent in obtaining the insurance. This intent was an element of the offense charged. It was also deemed admissible, however, because "intent was placed in issue in light of defendant's theory that the killing was committed by [Halm's wife] out of passion." *Id.* at 479 n. 3.

Given the importance of the life insurance to the theory of the State's case, it was entitled to present evidence tending to refute defendant's avowed purpose for buying the insurance on Walker's life. We believe the somewhat irregular circumstances surrounding defendant's actions in obtaining insurance on the life of his estranged wife approximately two years earlier fall within this category of proof. Entries in the journal indicating defendant was giving thought to killing his wife during the time the insurance was in force are a significant part of that chain of events.

It would lessen our concerns regarding unwarranted prejudice if the statements in the journal concerning plans to cause harm to other persons could be excised so that only the items relating to defendant's wife might be conveyed to the jury. Our examination of this material suggests, however, that this would distort the context within which defendant's plans vis-a-vis his wife were formulated and detract from a complete understanding of the events related. We accordingly hold that the trial court did not abuse its discretion in admitting the 143–page journal in its entirety over defendant's objections based on rule 403 and rule 404.

246 (1st Cir.), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976); *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.), *cert. denied,*

377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052, *reh'g denied,* 379 U.S. 874, 85 S.Ct. 27, 13 L.Ed.2d 83 (1964).

■ We cannot, however, agree with the trial court's decision to admit the contents of the other journal. It is difficult to imagine a more inflammatory subject matter for purposes of inducing prejudice into a trial than a suggestion that defendant, in order to cause a reward to be posted and then collect it, planned to kidnap and murder a newspaper carrier. The record indicates that this was a subject of great concern to the public because of similar crimes which had been publicized by the media.

The State urges that the cumulative effect of the evidence in the two journals identifies defendant as a scheming and manipulative person more capable of planning complex crimes involving deception than the ordinary citizen. It is not suggested, however, that the rather sketchy plans for carrying out the crimes described in the second journal are even remotely similar to the modus operandi of the crimes for which defendant was being tried.

In *State v. Walsh*, 318 N.W.2d 184 (Iowa 1982), we discuss problems in using evidence of similar crimes in order to establish that the same person committed both. We held that in order to permit this the crimes must be "strikingly similar" or of a "unique nature." *Id.* at 186. Federal courts applying rule 404 have rejected proof of allegedly similar crimes in various contexts when this evidence was offered to establish defendant's identity as perpetrator of the crime on trial. *See, e.g., United States v. Ezzell*, 644 F.2d 1304, 1306 (9th Cir.1981) (points of similarity between robberies were common to most robberies); *United States v. Krezdorn*, 639 F.2d 1327, 1331 (5th Cir.1981) (commission of thirty-two forgeries merely demonstrates repetition of similar criminal acts, thus indicating propensity to commit this crime); *United States v. Pisari*, 636 F.2d 855, 859 (1st Cir.1981) (use of identical threats in commission of similar robberies falls far short of a signature upon which to posit an inference of identity); *United States v. Myers*, 550 F.2d 1036, 1046 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978) (common practice of wearing stocking masks, carrying similar bags, and going armed with revolvers is not so unusual as tending to prove that two crimes were the work of a single bandit).

■ The State's claim that the cumulative effect of the entries in both journals serves to identify defendant as a person uniquely capable of committing the type of crime involved in the deaths of Walker and Willits is not persuasive. The thirteen-page journal does not appear to manifest any unique skills in crime preparation. The operational aspects of the proposed crimes are largely left to the imagination of the reader. The State urges that evidence of defendant's propensity for plotting criminal activity, manipulating people, and planting false clues for authorities suggests his participation in the present crimes because they involve the planting of false clues. The inference upon which this argument depends suffers from the fact that whether false clues were in fact planted is one of the most hotly contested factual issues in the case. Moreover, the attributes of scheming and manipulation upon which this inference depends are, we believe, precisely the type of character traits to which rule 404(a) relates. Unlike the entries in the 143–page journal, which have some relevance to the insurance motive, the traits depicted in the thirteen-page journal do not tend to establish any relevant fact in the case other than the type of propensity inference prohibited by that rule. The admission of such evidence over defendant's objection requires a reversal of his conviction as to both counts and the granting of a new trial.

## II. Constitutional Challenges to Evidence Contained in Defendant's Personal Journals.

Because we have upheld the admission of the 143–page personal journal against relevancy and character objections, it becomes necessary to consider constitutional challenges to its admissibility which were preserved in the district court.

A. *The search and seizure argument.* On July 25, 1977, defendant inadvertently

left the 143–page journal at Burger Palace, an eating establishment in Iowa City. Restaurant employees read portions of the journal and were alarmed by its contents. They called Iowa City police and informed them the journal evidenced an intent on the part of its author to cause injury or death to several persons. When defendant returned to Burger Palace later on the same day, he was stalled by employees and told he could pick up the journal the following morning. Meanwhile, unknown to defendant, the police took possession of the journal, read it and photocopied it. They later warned defendant's wife of potential danger. Defendant returned to Burger Palace the following morning, and the journal was returned to him.

Apparently some time during the investigation of the Walker and Willits deaths, Iowa City police made a copy of defendant's journal available to agents of the Division of Criminal Investigation. The original journal was subsequently obtained from defendant's attorneys prior to trial by means of a subpoena duces tecum. Defendant contends that the seizure, reading and copying of the journal by the Iowa City police were in violation of his rights under the fourth amendment to the federal constitution and article I, section eight of the Iowa Constitution.

We disagree. Given the public nature of the place where the journal was discovered and examined by the restaurant employees, we conclude that defendant's constitutional claims are no more meritorious than those rejected in *State v. Flynn,* 360 N.W.2d 762 (Iowa 1985). In *Flynn* business records of the defendant had been temporarily secreted on the grounds of a private golf club closed for the winter. The expectations of privacy at the location involved in *Flynn* may have been greater than defendant's expectations in the present case based upon the nature of the premises involved; yet, we found no fourth amendment violation.

■ In the present case, the actions of the private citizens employed at the restaurant in reading the contents of defendant's journal involve no constitutional violations. Once they discovered the journal contained evidence of death threats apparently soon to be perpetrated, their action in communicating this information to authorities was entirely lawful.[3] Once the police were informed by private citizens of the evidentiary nature of the journal with respect to planned criminal activity, their seizure of the journal and the copying of its contents at the invitation of its possessor presents no ground for constitutional challenge. *See State v. Campbell,* 326 N.W.2d 350, 353 (Iowa 1982). Nor does the subsequent action of the Iowa City police in sharing information lawfully obtained with the Division of Criminal Investigation constitute a violation of either the federal or state constitution.

■ B. *The fifth amendment argument.* Defendant also contends that, notwithstanding the holding in *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), rejecting the continuing application of *Boyd*-type fifth amendment protections formerly accorded seizure of private books and papers, some lingering fifth amendment protection remains with regard to personal diaries. We disagree. The point is well made by Professor LaFave in his treatise on search and seizure. There, the writer states that

> [t]he papers seized in *Andresen* were, as the Court repeatedly took pains to point out, "business records...." [T]hus it might be thought that the Court has not slammed the Fifth Amendment door shut entirely and notwithstanding *Andresen* the Court might on some later occasion hold that the Fifth Amendment

---

**3.** The last entry in the journal at the time it was inadvertently left at Burger Palace was dated July 23, 1977. That entry states, in part: "I'm sure now that Dine [defendant's wife] has to go. It will be either the first or second week in August, so this journal will not be around much longer.... I'll let her think I'm going to set her free, talk nice to her for a few minutes to build up her hopes, then slap her around hard and scare her again, then bury her. NO BODY—NO CRIME."

does protect certain private papers which are more private than were Andresen's documents concerning the land sales. This, however, seems unlikely. Given the kind of analysis employed in *Andresen*, "[n]o distinction can be drawn between business records and diaries.... [I]n all such cases the fact that evidence is obtained without requiring the accused to act or speak means 'testimonial compulsion' is lacking."

1 W. LaFave *Search and Seizure* § 2.6, at 394 (1978) (quoting Note, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments*, 90 Harv.L.Rev. 945, 978 (1977)). Consistent with these views, we find no fifth amendment protection against the State's evidentiary use of defendant's personal journals. To the extent defendant seeks to predicate a similar suppression of evidence claim on the first amendment, we reach a similar conclusion.

■ C. *Self-incrimination through compulsory production.* Defendant also contends his fifth amendment rights were violated as a result of the compelled production of the 143–page journal because the act of producing evidence in response to a subpoena has incriminatory communicative aspects apart from the contents of the papers produced. Had the subpoena been directed to defendant personally, he might have a valid argument on this issue based on discussion in *Fisher v. United States*, 425 U.S. 391, 410, 96 S.Ct. 1569, 1581, 48 L.Ed.2d 39, 55–56 (1976). In the present case, however, the compelled production of the journal was exacted from defendant's attorneys. The fifth amendment protects against self-incrimination but not against incrimination through the acts of others.[4]

**4.** Defendant suggests the *Fisher* court held that a client's fifth amendment privilege would be defeated unless, when the client is privileged against production of a document, the attorney is also not bound to produce it. We believe the Court in *Fisher* was only observing that, if some *Boyd*-type fifth amendment protection were still

### III. *Objections to Experimental Evidence.*

Finally, we consider defendant's claims that evidence admitted concerning the results of certain experiments conducted on physical evidence in the case by investigators is lacking in scientific reliability. Such claims are made with respect to (1) testimony about test firings through the windows of the Willits automobile, (2) testimony relating to the absence of postal cancellation impressions on the letter from defendant to Willits found near her body, and (3) testimony concerning similarities of a blindfold found on Willits' body and a pillowcase located at defendant's parents' home. The primary flaw in defendant's argument on all of these subjects is the assumption that the admission of the challenged evidence depends upon scientific reliability.

■ Iowa Rule of Evidence 702 provides:

If scientific, technical, or *other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion *or otherwise.*

(Emphasis added.) The "or otherwise" language of this rule suggests that, without regard to scientific reliability or expert opinion, a witness may describe relevant information produced by an experiment or comparison involving physical evidence in the case.

All that is required in order to qualify the witness for this purpose is sufficient personal knowledge to accurately describe the particular experiment or comparison. One who possesses such knowledge has the "specialized knowledge" necessary to assist the trier of fact if the results of the experiment or comparison is helpful to a

to be accorded private papers, then compulsory production of such papers from an accused's attorney might defeat that privilege. Similar considerations do not apply to those incriminatory aspects which flow solely from the act of responding to a subpoena.

clear understanding or determination of some fact in issue. This interpretation of rule 702 is fostered in C. McCormick *Evidence* § 202, at 600–01 (Cleary ed.1984) (The simplest experiments are often the most convincing, and expert testimony is not always cost-effective.). *See also Grant v. Younker Brothers,* 244 Iowa 958, 965, 58 N.W.2d 834, 839 (1953). Judged by these standards, we conclude that all of the defendant's objections to the admission of experimental or comparison data were properly overruled by the trial court.

We have considered all issues presented. We conclude that the error discussed in Division I of this opinion requires that the judgment of conviction on each count be reversed. The cause is remanded to the district court for a new trial.

REVERSED AND REMANDED.