**STATE of Iowa, Appellee,**

v.

**Armando Cardenas ARICIVIA,
Appellant.**

No. 90–1719.

Court of Appeals of Iowa.

Nov. 30, 1992.

Linda Del Gallo, State Appellate Defender, and Shari Barron, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Sheryl Soich, Asst. Atty. Gen., Thomas S. Mullin, Co. Atty., and Karrie J. Sierp, Asst. Co. Atty., for appellee.

Heard by DONIELSON, P.J., and HAYDEN and SACKETT, JJ.

DONIELSON, Presiding Judge.

The defendant, Armando Cardenas Aricivia, appeals from the judgment and sentence of the district court finding him guilty of first-degree murder.

On June 20, 1989, Kelly Jo Bramley was found strangled to death in the Sioux City apartment she shared with the defendant's brother, Humberto Aricivia. On March 13, 1990, Armando Aricivia was charged by trial information with first-degree murder in connection with the death of Bramley.

A jury trial commenced on September 18, 1990. The coroner testified Bramley died from strangulation, and the marks on her body were found consistent with a struggle and with sexual abuse. He estimated the time of death to be between 8:00 a.m. and 1:00 p.m. on June 20, 1989.

A criminalist with the DCI testified she performed blood tests on samples taken from the victim, Humberto, and the defendant. She compared those samples to samples taken from the sheets on Bramley's bed and vaginal swabs from her body. The criminalist testified she found spermatozoa on the vaginal swabs. She could not conclusively find Aricivia was the donor, but she also could not eliminate him as a donor. However, Humberto was eliminated as a donor of the spermatozoa.

Harold Deadman, the State's DNA expert, testified concerning tests performed on the DNA taken from the defendant, Humberto, Bramley, and the vaginal swabs from her body. Using these samples, he found DNA profiles present in the vaginal swab male fractions which matched the defendant's profile. Based on this match and the use of the FBI's black data base, the chance of the match being coincidental was one in 1.6 million. Over the defendant's objection, he testified that, using a Hispanic database, the chance of a coincidental match was one in 500,000.

Russell Little, who was Bramley's neighbor, testified that on the morning of June 20, 1989, he saw a bearded man standing at the window of Bramley's apartment. Little picked Aricivia's picture out of a police photo lineup, but was unable to identify the defendant at one of two depositions. At the second deposition, Little was able to identify the defendant because he had a beard at that time. An investigator for the defense testified Aricivia only had "stubble" on his face at the deposition. Over the defendant's objection, photographs taken of Aricivia following this deposition were introduced into evidence.

William Malloy, another neighbor, also testified he saw a bearded man who appeared to be talking to someone in Bramley's apartment. He was unable to pick the defendant's picture out of a police photo lineup, but he identified the defendant at trial.

Aricivia's brother Humberto testified he went to work at about 5:40 a.m. that morning and he got off work at 2:30 p.m. After work, he met up with several friends, including his brother, Armando Aricivia. Humberto testified Aricivia previously had a beard, but on that day he was clean shaven. Humberto also testified his brother was not welcome at his apartment because Bramley had told him Aricivia had raped her. He testified when he confronted Aricivia with the accusation of this incident, Aricivia asked for Humberto's forgiveness.

Joannie Saul, Aricivia's live-in girlfriend, testified for the State. She testified she, her brother John, and Aricivia had stayed up and smoked crack during the night of June 19 and the early morning of June 20. She testified that, around 7:20 a.m. on June 20, the defendant told her he was going to talk to Humberto and left. By about 11:00

a.m., Aricivia had returned. Joannie noticed he had shaved his mustache off and there were scratches on his back. Joannie testified Aricivia later told her if the police asked about the scratches, she should tell them he received them while playing. She further testified she did not make the scratches because her fingernails were too short. On cross-examination, Joannie admitted she knew Aricivia had been sleeping with another woman.

The State also introduced the deposition of Alberto Mendoza, who stated that Aricivia had told him he would kill Bramley for filing the sexual abuse charges against him and putting him in jail. The defendant attempted to introduce evidence from an Alberto Rodriguez who said Mendoza had told him he had lied in his deposition. However, the district court excluded the testimony on the ground the evidence was inadmissible hearsay.

The State presented evidence from Dorothy Loftus, also Bramley's neighbor, who testified that, on July 14, 1988, she saw a man she recognized as Humberto's brother crawl through Bramley's window at the victim's apartment. After the man left, Bramley appeared at Loftus's home and told Loftus that she had been raped.

Aricivia, through an interpreter, testified in his own defense. He stated he had been at a party at Ray Groth's house with Joannie on the night of June 19. He testified they briefly left the party, went to Aricivia's apartment, returned to the party at 4:00 a.m. and stayed until 7:00 a.m. They then returned to his apartment. In his testimony, he accounted for his activity and whereabouts for the entire morning and afternoon of June 20. Specifically, he testified he was back and forth between his apartment and Ray's house throughout the morning. He testified he had had sexual relations with another woman and he had been in a fight with Joannie over the matter that morning. He admitted he had shaved that day, but testified he had also shaved on June 19 before he went to reapply for food stamps. It was verified at trial that Aricivia had visited the food stamp office, but not whether Aricivia had a beard at that time.

The defense also read the deposition of Ray Groth into evidence. He testified Aricivia was at his house on June 19. He stated Aricivia returned the next day between 7:00 and 8:00 a.m. and stayed until 11:00 a.m. His account of Aricivia's whereabouts was inconsistent with Aricivia's testimony.

Other witnesses testified for both the State and the defense regarding Aricivia's whereabouts. The testimony of the various witnesses contained conflicting accounts of Aricivia's activity and whereabouts on June 20.

Prior to trial, Aricivia had filed a motion in limine arguing evidence of the sexual abuse charges filed by Bramley should be excluded because it constituted improper character evidence and it was highly prejudicial. The trial court denied the motion. Aricivia also filed a subsequent motion seeking to exclude evidence underlying the sexual abuse charge and arguing evidence that Bramley had later dismissed the sexual abuse charges should be admissible. The court overruled that motion as well.

Aricivia also filed a motion to suppress the State's DNA evidence and the statistics based on such evidence because the DNA evidence was not sufficiently reliable. This motion was denied. In addition, the defendant filed a motion for a protective order, a motion in limine and a motion to suppress alleging the State had improperly obtained a report from the defendant's DNA expert, Cellmark Diagnostics. This motion was also denied.

Aricivia subsequently filed two applications for discretionary review based on the trial court's ruling regarding the prior sexual abuse charges and the Cellmark DNA report. The applications for discretionary review were denied by a three justice panel of the supreme court. The trial court denied Aricivia's motion for reconsideration.

Following the jury trial, Aricivia was found guilty of first-degree murder. Aricivia filed posttrial motions for new trial and arrest of judgment which were denied. Aricivia now appeals.

Aricivia argues the trial court abused its discretion in (1) allowing into evidence the sexual abuse charges filed by Bramley one year prior to the murder, and excluding evidence that those charges were dismissed; (2) ruling the Cellmark DNA report was discoverable because it was privileged information and obtained through prosecutorial misconduct; (3) allowing the State's DNA expert to testify concerning the statistics based on FBI Hispanic data, where the minutes of testimony stated the expert would rely on the FBI black data base; and (4) ordering defense counsel to produce photographs of Aricivia from his file where those photographs constituted attorney work product. Aricivia also contends he received ineffective assistance of trial counsel by counsel's failure to argue Alberto Rodriguez's testimony that Alberto Mendoza admitted to lying in his deposition constituted a statement against penal interest and was thus admissible hearsay.

■ Our scope of review is for the correction of errors of law. Iowa R.App.P. 4. On the evidentiary issues, we review for an abuse of discretion. *State v. Halstead,* 362 N.W.2d 504, 506 (Iowa 1985). In order to show an abuse of discretion, one generally must show that the court exercised its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Blackwell,* 238 N.W.2d 131, 138 (Iowa 1976) (quoting *State v. Burnor,* 132 Vt. 603, 326 A.2d 138, 140 (1974)).

I. *Evidence of the Sexual Abuse Charges and the Subsequent Dismissal.* Aricivia first contends the district court abused its discretion in allowing the introduction of evidence concerning the sexual abuse charges filed against him and evidence of the events underlying the sexual abuse allegations. Aricivia also contends the district court abused its discretion in excluding evidence that the sexual abuse charges were subsequently dismissed.

■ Iowa Rule of Evidence 404(b) provides that evidence of "other crimes, wrongs or acts" is inadmissible to prove the defendant acted in conformity with the character the acts may show, but it is admissible for other purposes. In other words, evidence which has no relevancy except to show the defendant is more likely to have committed the crime charged because he is a bad person is inadmissible. *State v. Cott,* 283 N.W.2d 324, 326 (Iowa 1979). The exceptions to rule 404(b) are based upon the relevancy of certain evidence to the proof of some fact or element in issue other than the defendant's criminal disposition. *Id.* One purpose for which evidence of other crimes or acts may be admissible is to show proof of motive or intent. Iowa R.Evid. 404(b).

■ The admissibility of 404(b) evidence is determined by a two-part test: first, the evidence must be relevant to establish a legitimate issue in the case; and second, the probative value of the evidence outweighs the danger of unfair prejudice. *State v. Barrett,* 401 N.W.2d 184, 187, n. 2 (Iowa 1987). "Clear proof" of the alleged acts is also required when prior bad acts are admitted. *State v. Spargo,* 364 N.W.2d 203, 209 (Iowa 1985). Clear proof is a lesser standard than "beyond a reasonable doubt." *Id.*

■ Evidence of the sexual abuse charges filed against Aricivia by Bramley and of the events underlying those charges was relevant in proving Aricivia had the motive and intent to kill Bramley because she had put him in jail as a result of the sexual abuse charges. We agree there was clear proof which established sexual abuse charges were filed and the underlying events in question occurred. This proof included the testimony of Dorothy Loftus, the neighbor with whom Bramley spoke after the alleged rape; Humberto Aricivia, the defendant's brother; and Alberto Mendoza, who Aricivia had allegedly told that he was going to kill Bramley for filing the sexual abuse charges.

However, we find the unfair prejudice which resulted from this evidence substantially outweighed any probative value. Because the State introduced evidence surrounding the sexual abuse charges, evidence of the subsequent dismissal was also very relevant. Without evidence that the sexual abuse charges were dismissed, the

jury was free to infer Aricivia was also convicted of sexual abuse. Evidence surrounding the sexual abuse charges was highly prejudicial without the introduction of evidence of the dismissal. We find the district court abused its discretion in admitting this evidence.

We also find the district court abused its discretion in ruling the dismissal of the sexual abuse charges was not relevant and therefore inadmissible. The State argues criminal charges can be dropped for numerous reasons unrelated to the defendant's guilt or innocence. However, we remind the State of the definition of relevancy: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Iowa R.Evid. 401.

Obviously, by finding evidence surrounding the sexual abuse charges relevant, the district court did not make a factual finding that Aricivia had a specific motive to kill Bramley. Rather, the evidence lead to several relevant inferences favorable to the State. Consequently, we agreed this evidence was relevant in establishing motive and intent. Likewise, by finding the dismissal of the charges relevant, we are not making a factual finding that Aricivia did not commit the crime of sexual abuse or that Aricivia did not have a motive to kill Bramley. However; evidence of the dismissal would have led the jury to several relevant inferences favorable to the defendant. In determining the relevancy of the dismissal, we would expect the district court to apply this same lenient standard to evidence favorable to the defendant.

As a result, we find the district court abused its discretion both in admitting the evidence surrounding the sexual abuse charges and in excluding the evidence of the subsequent dismissal of those charges. Evidence that the defendant forcibly raped his brother's live-in girlfriend was highly inflammatory. By admitting only the portion of the evidence regarding the sexual abuse charges which was favorable to the State, the jury simply was not given the

entire truth. On our review of this issue, we are unable to say the defendant received a fair trial, and therefore we reverse and remand for a new trial.

II. *Prosecutorial Misconduct.* Aricivia also argues the Cellmark DNA report was illegally obtained through prosecutorial misconduct, and the district court erred in refusing to exclude the results of that report from evidence.

 In order to prove prosecutorial misconduct, the defendant must show misconduct occurred and the prosecutor's misconduct was "so prejudicial as to deprive the defendant of a fair trial." *State v. Anderson,* 448 N.W.2d 32, 33 (Iowa 1989) (citations omitted). Iowa Code of Professional Responsibility DR 1-102(A)(4) provides that "A lawyer shall not: ... [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." The record in this case shows the prosecutor, at the least, obtained the Cellmark through dishonesty and misrepresentation.

In March 1990, the defense filed a motion to preserve and produce evidence so that it could conduct its own testing on the remaining blood and semen samples. The State did not resist the motion and the samples were delivered to Cellmark Diagnostics, the private laboratory hired by the defense to conduct the testing.

On June 5, 1990, the prosecutor contacted defense counsel and requested a copy of Cellmark's test results. The defense refused and informed her the test results would not be voluntarily released to the State. That same day, defense counsel contacted Cellmark and notified them that under no circumstances was any information concerning the results to be released to anyone besides defense counsel. These instructions were followed up in a letter which was sent to Cellmark.

On June 19, 1990, without notifying the defense of her intent to do so, the prosecutor telephoned Cellmark and asked to speak with Paula Yates, the molecular biologist assigned to conduct the analysis of the samples. The next day, a Dr. Lisa Forman returned the call. The prosecutor identified herself as an Assistant Wood-

bury County Attorney and said, "... I just called to find out when the report is being sent out." After Dr. Forman said the report had already been sent, the prosecutor told her she had not received her copy and asked Dr. Forman to fax her a copy of the report. Dr. Forman agreed and sent the report to the prosecutor that same day.

The next day, following a conversation with Paula Yates, Dr. Forman discovered the State was not Cellmark's client in this case. She contacted the prosecutor, and described their conversation as follows:

> I then called Ms. Sierp and told her that, while it was completely my responsibility, I felt that she had withheld important information from me and had misled me into thinking she had a right to the report. I told her that my position was at risk and I had put my company in a very bad situation. She offered to talk "with someone" for me. I told her that wasn't necessary, that it was straight forward and that I would deal with it. She said that she could have gotten all the documents anyway through subpoena and she was just trying to take a short cut. I repeated that, while I take responsibility for not checking the case folder, she certainly led me to believe that she had a right to the report and indicated a familiarity with Paula. She said that was not her intent but that she was "... facing a trial date" and was just trying to get the information she needed without " ... jumping through all the hoops."

We do not agree the fact the prosecutor "told no untruth" in her conversation with Dr. Forman is determinative of whether misconduct occurred. While the prosecutor did not lie, Dr. Forman's account of this conversation strongly suggests the prosecutor intentionally misled Dr. Forman into thinking the State was Cellmark's client and she was entitled to the test results. The prosecutor knew defense counsel would not voluntarily release the test results to the State. She knew the State was not the client of Cellmark. She also should have known that privilege should have prevented the State from receiving the results directly from Cellmark. We find the above

actions of the assistant county attorney constitute prosecutorial misconduct.

However, we find no unfair prejudice resulted from this misconduct. The Cellmark report was not offered by either party and the State never mentioned the existence of this report at trial. The Cellmark report, like the FBI report, indicated Aricivia's DNA sample matched the vaginal sample taken from the victim. Finally, we do not agree the above misconduct directly prevented the defendant from retaining other defense experts. Rather, it was the district court's ruling which allegedly would have affected the defendant. Therefore, although we agree misconduct occurred, we do not make a finding of prejudice and will not reverse the conviction of Aricivia on this ground.

However, we find the evidence surrounding the sexual abuse charges, some of which the district court allowed into evidence and some of which the court excluded from evidence, constituted unfair prejudice. We believe Aricivia's trial was tainted with unfair prejudice as a result of the "half-truths" admitted into evidence regarding the sexual abuse charges. We do not believe the jurors in this case could have given the evidence of the sexual abuse charges the proper weight it deserves without having heard *all* of the relevant evidence surrounding this issue. We recognize Aricivia is not entitled to a perfect trial. However, he is entitled to a fair trial. Based upon the prejudicial effect of this evidence, we are convinced Aricivia did not receive a fair trial.

Because of our result, we will not address the other issues raised by the defendant.

The costs of this appeal are taxed to the State.

For the reasons stated, the defendant's conviction is reversed and the case is remanded for a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.