# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 96-2699/96-2702

_____

| | |
|---|---|
| Bryan Kirby Barrett, | * |
| | * |
| Appellee/Cross-Appellant, | * |
| | * Appeals from the United |
| v. | * States District Court for the |
| | * Southern District of Iowa. |
| Gerardo Acevedo, | * |
| | * |
| Appellant/Cross-Appellee. | * |

_____

Submitted: September 23, 1998

Filed: March 9, 1999

_____

Before BOWMAN, Chief Judge, McMILLIAN, RICHARD S. ARNOLD, JOHN R. GIBSON, FAGG, WOLLMAN, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, MURPHY, and KELLY,[1] Circuit Judges.

_____

BEAM, Circuit Judge.

Gerardo Acevedo, on behalf of the State of Iowa (the State), appeals the district court's grant of habeas corpus relief under 28 U.S.C. § 2254 to Bryan Kirby Barrett. We reverse.

_____

[1]Judge Kelly died on October 21, 1998. At conference, he voted to affirm the district court on the Confrontation Clause issue.

## I.     BACKGROUND

Barrett has been twice tried for, and twice convicted of, the murders of two young women.  The Iowa Supreme Court set aside his first conviction and granted him a new trial on the ground that certain evidence had been improperly admitted.  See State v. Barrett, 401 N.W.2d 184, 189 (Iowa 1987) (Barrett I).  Barrett was again tried and convicted.  His second conviction was affirmed by the Iowa Supreme Court.  See State v. Barrett, 445 N.W.2d 749 (Iowa 1989) (Barrett II).  Barrett then sought a writ of habeas corpus under 28 U.S.C. § 2254.  The district court granted the writ, finding that Barrett's First and Fifth Amendment rights had been violated by the trial court's admission of a journal and that Barrett's Sixth Amendment right to confront witnesses had been violated by the trial court's admission of hearsay testimony.

The State appealed to this court and Barrett cross-appealed, contending that the Iowa Supreme Court had improperly relied on the prior reversed conviction in making findings in his second appeal.  A panel of this court reversed the district court on the First and Fifth Amendment issues but agreed with the district court that Barrett's Sixth Amendment Confrontation Clause right had been infringed.  See Barrett v. Acevedo, 143 F.3d 449 (8th Cir. 1998) (rehearing en banc granted, opinion vacated July 28, 1998).  The State then sought a rehearing and the matter was reheard en banc.  We now reverse the district court.[2]

The evidence adduced at Barrett's second trial showed that the bodies of two young women, Cynthia Kay Walker and Carol Ann Willits, were found several miles apart in rural Iowa on the morning of February 23, 1979.  Both had been shot with a .38 caliber weapon.  Cynthia Walker had been shot three times and was found dead

_____

[2]Because we agree with the panel's holdings on the applicability of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and Barrett's First and Fifth Amendment claims, those portions of the panel's vacated opinion are essentially restated herein in Parts II(A) and (C).

on a gravel road.  Carol Ann Willits had been shot once through the temple and was found in the front seat of her car on a nearby blacktop road.  She was blindfolded and was wearing men's work gloves.  The gun was found in her lap.

Bryan Kirby Barrett had been acquainted with both women.  Cynthia Walker was Barrett's girlfriend at the time of her death, and Carol Ann Willits may also have been dating him, although her friends testified that the two were only friends.  A note in Carol Ann Willits's handwriting, torn from a spiral steno notebook, was found in the car near her body.  The note was addressed to Barrett and stated in part, "I'm sorry I've caused you so much trouble," and "I hope you find your peace/I found mine."  A torn-up rough draft of the note, also from a spiral steno notebook, was found in the trash at Carol Willits's apartment.  Several crossed-out notations appear in the margins of the reconstructed rough draft.  These include several misspellings of Carol's name, i.e., "Kayrol," "Caryl."  Curiously, a post script added to the rough draft was also added to the final draft as a post script, not incorporated into the body of the letter.  The remnant of yet another draft of the letter was also found in the car—a torn corner, still attached to the spiral notebook.  The rest of that draft was never found.

Also found in the car was a three-page postmarked letter from Barrett to Willits.  The letter informed her that he did not reciprocate her romantic feelings for him.  The pages of the letter, however, had no cancellation impressions on them, as if they were put in the envelope after it had been mailed.  A valentine card in an envelope addressed to Barrett from Cynthia Walker was also found in the car, as were strands of Walker's hair.

The defense theory was that Willits was romantically involved with Barrett and had caught him in a compromising situation with Walker.  In a jealous rage, Willits was to have killed Walker and then committed suicide.  The State's theory, on the other hand, was that Barrett had killed Walker to obtain life insurance proceeds from

a policy he had purchased on Walker's life. The State further contended that Barrett had left false clues to give the impression of murder/suicide by Willits.

The evidence showed that Barrett had taken out a life insurance policy on Cynthia Walker shortly before her death. He was the beneficiary on the $50,000 policy, which had a double indemnity clause in the case of a nonnatural death. The State also produced evidence that Barrett had once forged his ex-wife's signature on an application for life insurance and had then plotted to kill her with money as his motive. This scheme was shown through a 143-page journal that was received into evidence at the second trial.[3] The journal, which had been written in 1977, had been inadvertently left by Barrett at a fast food restaurant and had been turned over to police. It described Barrett's feelings about a pending divorce and child custody dispute and discussed various schemes to harm or kill his wife and others.

The State also produced evidence that, although Willits had purchased the gun, she had done so at Barrett's behest and with his money. Significantly, the State showed that Willits had applied for a permit for the weapon before she had any motive to kill Cynthia Walker, that is, before she ostensibly found Barrett with Walker.[4] There was also evidence that the blindfold found on Willits was made from material matching a pillowcase found in Barrett's parents' home. In addition, there was evidence that two cars had been seen on the blacktop road on the night of the

---

[3]An additional, undated journal that outlined a scheme to kill a paperboy, had been admitted into evidence at Barrett's first trial. On appeal, the Iowa Supreme Court found that the journal's admission was error because it had been admitted for the improper purpose of showing Barrett's alleged propensity to commit the crimes. The court reversed and remanded for a new trial. See Barrett I, 401 N.W.2d at 189.

[4]The State further showed that it was doubtful that Willits could have found Walker and Barrett together on the night it was supposed to have occurred. Her car was being repaired on that day and she would have had to walk twenty blocks in sub-zero temperatures.

murders–one matching the description of Willits's car and one with rectangular taillights, similar to those on Barrett's parents' car.

The evidence also portrayed Carol Ann Willits as an unlikely murderer. On the night of the murder, she had prepared a spaghetti dinner for some former coworkers. The women testified that she was in a good mood, showed them family Christmas pictures and spoke excitedly of a trip to Ireland she was planning with friends. Her friends testified that she was a helpful, cheerful woman who regarded Barrett as a friend. Evidence showed that Willits had received a phone call from Barrett that night.

Expert testimony was presented on the issue of whether Willits's death was a suicide or a homicide. Dr. Vincent DiMaio, a physician and forensic pathologist, testified that, in his opinion, Willits had been murdered. He based his opinion on six factors: (1) the presence of a blindfold, which he found highly unusual in a suicide; (2) the knot on the blindfold was tied on the left by a right-handed person; (3) Willits was wearing large cotton work gloves, which would have made it difficult for her to tie the knot and which would have become bunched in the trigger of the gun; (4) Willits's hand was found in her lap with the gun on top of her hand when the recoil of the gun should have sent the hand and the gun to the right; (5) the path of the bullet was straight, when in most suicides the path of the bullet is at an angle; and (6) there was an intact paper bag on the seat which should have been flattened by the gun. He emphasized that each of these factors, standing alone, could be discredited, but that his opinion was based on the presence of all six factors.

On cross-examination, Dr. DiMaio conceded that he had formed his opinion on the first day he was contacted by authorities. This exchange followed:

> Q. And you reached that judgment on the 29th day of November and you haven't changed it, have you?

A.   Nothing has been presented to me since then to change the opinion.

Q.   Then you're not about to.  You're 99 percent right and you're not about to change your opinion, are you, Doc?

A.   I change my opinions when you present material to me to show that I am wrong and then I'll change my opinion.

Trial Transcript at 617.

To counter the implication that Dr. DiMaio was "so inflexible or dogmatic that [he] would never change [his] opinion if presented with contrary evidence," Dr. DiMaio was asked, on redirect examination, whether it was common practice for forensic pathologists to discuss cases with colleagues when coming to a professional conclusion.  Id. at 619.  He answered in the affirmative, noting that such discussions helped avoid a "God complex."  Id.  Dr. DiMaio was then asked if any of his colleagues "[had] given [him] persuasive reason to disregard [DiMaio's] opinion."  Id. at 622.  Over Barrett's hearsay objection, Dr. DiMaio was allowed to answer and stated, "No, sir."[5]  Id. at 622.

Three other expert witnesses testified that the death was a suicide.  Each of these experts discredited the factors that Dr. DiMaio relied on in forming his opinion.  Although each factor was discredited singly, there was no refutation of the factors in combination.

---

[5]That answer is the subject of Barrett's Sixth Amendment Confrontation Clause claim.

## II.    DISCUSSION

### A.  Applicability of the Antiterrorism and Effective Death Penalty Act

First, the parties dispute the applicability of a provision of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to Barrett's habeas petition.  The State contends that the Act's amended standard for granting habeas relief applies here, see 28 U.S.C. § 2254(d)(1), while Barrett takes an opposing view.  In the district court's order certifying probable cause for appeal, the district court held that the Act did not apply to this pending case.  We review the district court's legal conclusion de novo.  See Hendrix v. Norris, 81 F.3d 805, 807 (8th Cir. 1996).

The Act was signed into law on April 24, 1996, and, among other things, it: (1) amended certain sections of chapter 153 of Title 28 of the United States Code, which govern all federal habeas corpus proceedings; and (2) created a new chapter 154 which applies only to habeas proceedings in capital cases.  As to capital cases, the Act expressly provides that "[c]hapter 154 . . . shall apply to cases pending on or after the date of enactment of this Act."  Pub. L. No. 104-132, § 107(c), 110 Stat. 1226 (1996).  In contrast, the Act is silent as to whether the amendments to chapter 153 apply to pending cases.

We may summarily dispose of this issue because the Supreme Court has resolved it.  In Lindh v. Murphy, 117 S. Ct. 2059 (1997), the Court addressed the issue of "whether that new section of the statute dealing with petitions for habeas corpus governs applications in noncapital cases that were already pending when the Act was passed."  Id. at 2061.  The Court concluded that amended 28 U.S.C. § 2254(d) does not apply to pending cases, emphasizing Congress' express statement in the Act that new chapter 154 shall apply to pending cases, in contrast with congressional silence as to the applicability of amended chapter 153 to pending cases.  The Court read this "as indicating implicitly that the amendments to chapter 153 were

assumed and meant to apply to the general run of habeas cases only when those cases had been filed after the date of the Act." Id. at 2063. The Court reasoned that "[n]othing . . . but a different intent explains the different treatment." Id. at 2064. The difference between the two chapters "illustrates the familiar rule that negative implications raised by disparate provisions are strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted." Id. at 2065.

Based on the Supreme Court's decision in Lindh, and the fact that Barrett's habeas petition was filed on February 5, 1991, we conclude that 28 U.S.C. § 2254(d), as amended by the Act, does not apply to Barrett's pending habeas corpus petition. Accordingly, we cannot apply the amended standard to Barrett's habeas petition and need not address Barrett's argument that the Act is unconstitutional.

## B. Confrontation Clause

### 1. Procedural Bar

As a threshold matter, the State argues that Barrett's Confrontation Clause claim is procedurally barred. Before a state prisoner is entitled to federal habeas corpus relief, he must first exhaust his state remedies and present the habeas claim to the state court. See Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc). If a petitioner has not presented his habeas corpus claim to the state court, the claim is generally defaulted. See id. We will not review a procedurally defaulted habeas claim because the state has been deprived of an opportunity to address the claim in the first instance. See id. In order to present a habeas claim to the state court, a prisoner must "fairly present" not only the facts, but also the substance of his federal habeas corpus claim. See id. In this circuit, to satisfy the "fairly presented" requirement, a petitioner is required to refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case

raising a pertinent federal constitutional issue. See id. at 411-12. Presenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement. See id. at 412.

Although we are inclined to believe that Barrett's claim was not so "fairly presented" to the state court, and thus is procedurally defaulted, we need not decide the difficult question of whether Barrett's various state court filings would meet our standards. Since we find Barrett cannot prevail on the merits, we see no reason to belabor this issue. Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated. See Lambrix v. Singletary, 117 S. Ct. 1517, 1523 (1997); Chambers v. Bowersox, 157 F.3d 560, 564 n.4 (8th Cir. 1998) ("The simplest way to decide a case is often the best.").

### 2. Merits

Barrett's Sixth Amendment claim centers on Dr. DiMaio's answer, "No, sir, " to the question whether any colleagues had given DiMaio persuasive reason to disregard his own opinion.[6] The Iowa Supreme Court, without mentioning the Sixth Amendment, found that the statement amounted to improper hearsay under Iowa law. See Barrett II, 445 N.W.2d at 754. Although the court stated that it was "inclined to disapprove" Dr. DiMaio's testimony, it expressly deferred considering whether the statement "amounted to abuse requiring reversal." Id. at 751. The court, however,

---

[6]Barrett's theory is that the statement implies that the unnamed colleagues agreed with Dr. DiMaio. That is not a necessary implication of the statement. DiMaio's answer could also be understood to mean either that: (1) his colleagues had not stated any opinions; or (2) his colleagues disagreed with him but were unable to persuade him with their reasoning.

later found that even if the statement were hearsay, its admission would nonetheless amount to harmless error.  See id.

The court conceded that the declaration would not be hearsay if offered in federal court or in most, if not all, other state courts.  See id. (rejecting the positions of other state and federal courts and relying on its pre-Rule 703 doctrine of "obscured" hearsay).  The State of Iowa is, of course, free to construct such evidentiary rules as it deems proper and it has apparently formulated an unusual hearsay rule with respect to Rule 703 evidence.[7]   The Iowa Supreme Court's finding

_____

[7]The trial court overruled Barrett's hearsay objection and admitted the statement as the type of comment relied on by people in Dr. DiMaio's field to form opinions. Trial Transcript at 620.  Evidence relied on by experts in forming their opinions is Rule 703 evidence.  See Fed. R. Evid. 703; Iowa R. Evid. 703.  We are not fully convinced that Dr. DiMaio's statement qualifies as this type of evidence, but note that Rule 703 evidence is not generally regarded as hearsay.  See Boone v. Moore, 980 F.2d 539, 542 (8th Cir. 1992).  This type of evidence is never admitted for the truth of the matter asserted, but simply to show a basis for an expert's opinion.  See id. (noting "the evidence is not offered, nor admissible, for the fact of the matter therein asserted, but simply to indicate the information and material relied upon by the expert").

Even if the Rule 703 statement were regarded as hearsay, it would not violate the Confrontation Clause.  The Confrontation Clause and the hearsay rule are not coextensive.  See Ohio v. Roberts, 448 U.S. 56, 62-65 (1980).  An out-of-court statement can pass constitutional scrutiny if the declarant is unavailable and the statement is shown to have inherent reliability.  See Idaho v. Wright, 497 U.S. 805, 814-15 (1990).  Such reliability can be presumed if the evidence either:  (1) falls within a firmly rooted hearsay exception or (2) has "particularized guarantees of trustworthiness."  Id. at 815.  It must be shown to be "so trustworthy that adversarial testing would add little to its reliability."  Id. at 821.  In other words, "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial."  Id. at 820.

that Dr. DiMaio's statement should be characterized as obscured hearsay under Iowa law does not impact our Confrontation Clause analysis. If the Iowa Supreme Court characterizes certain evidence as hearsay under Iowa law, it does not necessarily follow that admission of such evidence violates the Confrontation Clause of the Constitution. If that were so, constitutional requirements would vary from state to state, depending on each state's evidentiary rules. Our analysis is not dependent on whether a state court defines an out-of-court statement as hearsay, but on whether the statement violates the Sixth Amendment.

When the outcome of federal habeas litigation involves a matter of state law, a federal court is bound by a legal interpretation made by the state's highest court. See Clark v. Groose, 16 F.3d 960, 962 (8th Cir. 1994). Of course, admissibility of evidence at a state trial is a matter of state law and ordinarily will not form the basis for federal habeas corpus relief. See id. Only when the evidentiary ruling impinges

---

In the context of Rule 703 evidence, such trustworthiness is shown by the testifying expert's reliance on the material in forming his opinion. See, e.g., United States v. Abbas, 74 F.3d 506, 512-13 (4th Cir. 1996) (noting "Rule 703 exists so that scientific standards may be admitted as trustworthy and reliable exceptions to the hearsay rule" and recognizing that "the right of confrontation is not violated by an expert's reliance on out-of-court sources where the utility of trial confrontation would be remote and of little value to either the jury or the defendant"); United States v. A & S Council Oil Co., 947 F.2d 1128, 1134 (4th Cir. 1991) (stating that Rule 705, which allows cross-examination on the bases for the expert's opinions, furnishes the means through which concerns about admission of inadmissible evidence under 703 are vindicated); Reardon v. Manson, 806 F.2d 39, 41 (2d Cir. 1986) (noting "[e]xpert reliance on the output of others does not necessarily violate the confrontation clause where the expert is available for questioning concerning the nature and reasonableness of his reliance"); United States v. Simmons, 773 F.2d 1455, 1460 (4th Cir. 1985) (finding no Confrontation Clause violation because the utility of confronting ATF record-keepers at trial was negligible); and American Universal Ins. Co. v. Falzone, 644 F.2d 65, 66-67 (1st Cir. 1981) (physician's reliance on out-of-court statements, subject to cross-examination, suffices).

on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy. See id. Our inquiry is thus confined to whether the admission of Dr. DiMaio's statement violated Barrett's Sixth Amendment right to confrontation.

We accord a presumption of correctness to state court factual findings in a habeas corpus action. See 28 U.S.C. § 2254(d). That presumption does not extend, however, to a mixed question of law and fact. See Blair v. Armontrout, 916 F.2d 1310, 1318 (8th Cir. 1990). Mixed questions involve the application of legal principles to the historical facts of a case. See id. Whether a hearsay statement violates the Confrontation Clause is such a question. See Gochicoa v. Johnson, 118 F.3d 440, 445 (5th Cir. 1997), cert. denied, 118 S. Ct. 1063 (1998); Swan v. Peterson, 6 F.3d 1373, 1379 (9th Cir. 1993). Accordingly, we give deference to the state court's factual findings regarding the timing, manner, and circumstances of the hearsay statement, but review de novo the ultimate determination that Barrett's Confrontation Clause rights were violated. See Swan, 6 F.3d at 1379.

We find that the statement in question, whether or not characterized as hearsay under Iowa law, is not the type of utterance that violates the Confrontation Clause. Hearsay is ordinarily an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Therefore, by definition an out-of-court statement is not hearsay if it is not offered to prove the facts asserted. See Roberts v. Newville, 554 N.W.2d 298, 300 (Iowa Ct. App. 1996). A common type of statement that falls outside the hearsay definition, because it is not offered for its truth, is a statement that is offered to show its effect on the recipient. See id. Thus, an out-of-court statement which is offered to reveal the recipient's state of mind is not hearsay. See id. A statement that is not hearsay raises no Confrontation Clause concerns. See Tennessee v. Street, 471 U.S. 409, 414-17 (1985) (stating an accomplice's out-of-court statement was nonhearsay because it was offered to show, not what happened at the murder scene, but what happened when the accomplice confessed); United States v. Inadi,

-12-

475 U.S. 387, 394 (1986) (referring to co-conspirator's out-of-court statements as an "exemption to the hearsay rule").

In this case, the evidentiary value of any colleagues' statements that were made to Dr. DiMaio did not arise from the truth of the statements, but rather from their effect on Dr. DiMaio. Dr. DiMaio did not, as Barrett claims, recite opinions of his colleagues without providing Barrett the opportunity to confront and cross-examine the individuals. An examination of the testimony in context shows that it was intended to reveal Dr. DiMaio's state of mind. After stating that it is common practice in forensic medicine to discuss findings and conclusions with associates, Dr. DiMaio was asked if any of his colleagues "[had] given [him] persuasive reason to disregard [DiMaio's] opinion." Trial Transcript at 621. He was asked, in other words, about his state of mind after these discussions. Barrett's counsel had opened the door to this line of inquiry by attempting to portray Dr. DiMaio's mind-set as inflexible and dogmatic. The line of questioning was aimed at negating that inference.

Accordingly, we find Dr. DiMaio's answer did not constitute evidence that triggers a Sixth Amendment confrontation issue.

Most importantly, we find that, even if the statement were hearsay and it were to violate the Confrontation Clause, any error would be harmless. A violation of the Confrontation Clause is subject to harmless error analysis. See Harrington v. Iowa, 109 F.3d 1275, 1279 (8th Cir. 1997). We review the district court's harmless error analysis de novo. Pruett v. Norris, 153 F.3d 579, 590 (8th Cir. 1998).

In a habeas corpus case, we apply the more deferential harmless error review standard of Brecht v. Abrahamson, 507 U.S. 619 (1993) (substantial or injurious effect or influence on the jury's verdict) to constitutional errors that have been subject to harmless error analysis by state courts. See Joubert v. Hopkins, 75 F.3d 1232, 1245 (8th Cir. 1996). However, we use the strict standard set out in Chapman v.

-13-

California, 386 U.S. 18 (1967) (harmless beyond a reasonable doubt) in cases where the state court has not applied the Chapman analysis in the first instance. See Joubert, 75 F.3d at 1245. The Iowa Supreme Court conducted harmless error review on the state law hearsay issue, but did not specifically rely on the Chapman standard for review of constitutional errors. It did, however, apply a similarly rigorous test. See Barrett II, 445 N.W.2d at 754. It presumed the hearsay statement was prejudicial error unless the evidence affirmatively established the contrary. See id. Thus, we are of the view that the harmless error review that the Iowa Supreme Court conducted was essentially the same as that required by Chapman. Accordingly, we would be free to proceed under Brecht. However, we need not decide which standard to apply here, because under even the stringent standard, we find the admission of the statement was harmless "beyond a reasonable doubt."

In the context of a Confrontation Clause violation, to determine whether error is harmless beyond a reasonable doubt, we must examine the other evidence adduced at trial and determine whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. See Lufkins v. Leapley, 965 F.2d 1477, 1481 (8th Cir. 1992). We must consider a host of factors including: (1) the importance of the witness's testimony to the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of corroborating or contradicting testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. See Orndorff v. Lockhart, 998 F.2d 1426, 1431 (8th Cir. 1993).

This was not a close case. Our review of the record shows that this case was much more than a "battle of the experts," with Dr. DiMaio's testimony being pivotal. The prosecution assembled a solid case based on compelling circumstantial evidence. Barrett had purchased a $50,000 life insurance policy on Cynthia Walker. The policy contained a double indemnity clause in case of nonnatural death. The State offered proof that Carol Willits purchased the murder (and ostensible suicide) weapon at

-14-

Barrett's request. The State further presented evidence that a car with rectangular taillights, similar to Barrett's parents' Buick, had been seen on the road where Willits died. There was also evidence that the blindfold used on Carol Willits was made of fabric that matched a pillowcase found in Barrett's parents' home.

The most damaging evidence, the admission of which the court affirms today, was contained in Barrett's earlier journal. The 143-page handwritten journal details numerous plans and schemes to kill or maim his ex-wife, including plans to burn her face with acid. The journal is replete with drawings, diagrams, and sketches of his sinister designs. In the journal, Barrett repeatedly refers to his need to get rid of his ex-wife. The State also showed that, contemporaneously with the inception of the journal, Barrett had forged his ex-wife's signature on an application for life insurance. This evidence tended to negate Barrett's innocent explanation for his later purchase of insurance on the life of his then-girlfriend, Cynthia Walker.[8] It is hard to imagine that the scientific testimony of experts would overwhelm a jury in the face of such compelling evidence. In short, based on this evidence, a reasonable juror could find, without relying on the expert testimony, that Barrett committed these murders.

In fact, however, the expert testimony, favors the prosecution. The prosecution presented Dr. DiMaio, who testified that, in his opinion, Carol Willits was murdered. He based his decision on a combination of six factors. None of the other expert witnesses could discredit the combined factors. We find that Dr. DiMaio's testimony is more persuasive. It simply makes more sense than the testimony of the other experts. We have no difficulty finding that the jury believed Dr. DiMaio over the others, without regard to any asserted bolstering of his testimony by unnamed

---

[8]It is not surprising that Barrett's "innocent" explanation did not sway the jury. His explanation for the purchase of insurance on his girlfriend's life was that he planned to take her on a trip to California with him and was afraid her parents would sue him if something happened to her.

supporters. Having reviewed the record of this case, we find any error to be harmless beyond a reasonable doubt.

## C. The Journal

### 1. First Amendment

As explained above, Barrett wrote a 143-page journal that had its last entry dated July 1977, which was approximately two years before the deaths of Willits and Walker. In July 1977, Barrett inadvertently left this journal in a restaurant in Iowa City. See Barrett I, 401 N.W.2d at 189-90. Restaurant employees found the journal and alerted the police because of the nature of the journal's entries. The police made a copy of the journal, although the original journal was returned to the restaurant and subsequently to Barrett. See id. at 190. The police provided a copy of the journal to agents of the Division of Criminal Investigation during the investigation of the two deaths. Prior to Barrett's first trial, the State subpoenaed the original journal from Barrett's counsel, and it was produced and admitted into evidence over Barrett's objection at trial. See id. On appeal, the Supreme Court of Iowa affirmed the admission of the journal and held that it was "relevant and material to some legitimate issue other than a general propensity to commit wrongful acts." Id. at 187. The court held that the journal entries, when considered with other evidence in the case, were "relevant as tending to dispel an innocent purpose for defendant's action in obtaining insurance on Walker's life." Id. at 188.

At Barrett's second trial, this journal was again admitted into evidence over his objection. On appeal, Barrett argued that evidence surrounding his purchase of life insurance on his wife, including his journal, was erroneously admitted because he did not purchase the insurance for a sinister purpose. Barrett contended that he obtained the insurance because his wife lost her job and therefore lost the life insurance provided by her employer. See Barrett II, 445 N.W.2d at 752. The Supreme Court

-16-

of Iowa held that Barrett's explanation went to the weight of the insurance evidence and not its admissibility.

The federal district court held that admitting Barrett's journal into evidence violated his rights under both the First Amendment and the Fifth Amendment. We review the district court's legal conclusions de novo. See Hendrix, 81 F.3d at 807.

The district court held that under Fisher v. United States, 425 U.S. 391 (1976), Barrett had stated a legally-cognizable First Amendment claim. Fisher involved the IRS's summons to the taxpayers' attorneys to obtain tax-related work papers. See id. at 393-94. The Court upheld the seizure of the documents under the Fifth Amendment, as will be discussed below, but left open the possibility that more personal documents might find protection elsewhere, either in the Constitution, such as under the First or Fourth Amendments, or through an evidentiary privilege. See id. at 401.[9]

The State argues that to the extent that Fisher held that the First Amendment protects personal papers, only those documents raising freedom of association, and not freedom of speech, concerns are protected. The State emphasizes that the case cited by the Supreme Court in connection with the First Amendment, NAACP v. Alabama, 357 U.S. 449 (1958), involved the NAACP's membership list and its members' freedom of association, and did not raise freedom of speech issues.

_____

[9]In a footnote, the Court further explained that "[s]pecial problems of privacy which might be presented by subpoena of a personal diary, United States v. Bennett, 409 F.2d 888, 897 (2d Cir. 1969) (Friendly, J.), are not involved here." Fisher, 425 U.S. at 401 n.7. The Bennett case involved a Fourth Amendment challenge to seizing a letter but did not address the implications of the First Amendment. See Bennett, 409 F.2d at 896-97.

Public disclosure of membership identities may, in some circumstances, pose a very real threat to freedom of association. Accordingly, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." Id. at 462. This case, however, is based upon Barrett's privacy and speech interests in his journal, and he does not contend that publicly disclosing his journal will chill his right to freely associate.

We need not, and do not, decide whether Fisher's suggestion that the First Amendment may protect certain private papers applies not only to papers implicating freedom of association interests, but also to those implicating freedom of speech interests. Even assuming that the First Amendment does protect private papers raising certain types of speech interests, we do not believe that Barrett's journal is the type of speech that would, or should, be constitutionally protected. The risk that Barrett's speech would be curtailed through public disclosure was created by Barrett himself when he left his journal in a public place. In fact, one type of harm that could arise from public disclosure—that Barrett would stop making entries in his journal because he no longer felt free to express himself— may have already occurred since he ceased writing in this journal soon after the police discovered it. But it was Barrett's own action, and not government action, that caused such speech to cease. See United States v. Apker, 705 F.2d 293, 305 (8th Cir. 1983).[10]

Moreover, we believe that more recent Supreme Court cases reflect less willingness to recognize First Amendment interests in criminal cases. In Wisconsin

---

[10]In United States v. Apker, we rejected a First Amendment challenge to a warrant seeking, among other things, disclosure of the membership list of a Hell's Angels group. We noted that the group members publicly identified themselves as Hell's Angels by their dress; therefore, any additional harm from disclosing their membership list was unlikely. See Apker, 705 F.2d at 305. Similarly, here, it is Barrett who publicly disclosed his speech, not the government.

v. Mitchell, 508 U.S. 476 (1993), the Court, in a unanimous opinion, upheld a state statute that enhanced the defendant's sentence for aggravated battery and theft because he intentionally selected his victim because of his victim's race. While enhancing a sentence merely because the government does not agree with a defendant's beliefs would violate the Constitution, the statute permissibly "single[d] out for enhancement bias-inspired conduct because this conduct is thought to inflict greater individual and societal harm." Id. at 487-88. The Court also held that:

> The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.

Id. at 488 (citing Haupt v. United States, 330 U.S. 631 (1947));[11] see also Dawson v. Delaware, 503 U.S. 159, 165 (1992) ("[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at

---

[11]Barrett argues that Wisconsin v. Mitchell's ruling is limited to post-trial sentencing and does not apply to trials. As the quoted language shows, however, the Court observed that such evidence could be used for trial purposes also. Moreover, we have relied upon Wisconsin v. Mitchell for this proposition in subsequent cases. See, e.g., Richenberg v. Perry, 97 F.3d 256, 263 (8th Cir. 1996) (First Amendment not violated by using service member's declaration of homosexuality as evidence of engaging in conduct inconsistent with military activity), cert. denied, 118 S. Ct. 45 (1997); United States v. Dunnaway, 88 F.3d 617, 618-19 (8th Cir. 1996) (First Amendment not violated by admitting evidence of defendant's racist views, behavior, and speech to prove discriminatory purpose and intent, an element of the crime); United States v. Dinwiddie, 76 F.3d 913, 926 n.10 (8th Cir. 1996) (First Amendment would be violated by punishing defendant for expressing her view on abortion, but it was not violated by using her statements as evidence of intimidation with threats of force).

sentencing simply because those beliefs and associations are protected by the First Amendment.").

We conclude that the State did not violate Barrett's First Amendment right when it obtained his journal by subpoena duces tecum, and we reverse the district court on this issue.

## 2. Fifth Amendment

The district court also held that Barrett's Fifth Amendment right not to incriminate himself was violated through a subpoena duces tecum requiring him to produce his journal.

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment's protection applies only when the accused is <u>compelled</u> to make a <u>testimonial communication</u> that is incriminating. <u>See</u> <u>Fisher</u>, 425 U.S. at 408. The Fifth Amendment's protection may also be implicated because an act of complying with a government demand for documents will amount to a testimonial act, i.e., the accused's testifying to the existence, possession, or authenticity of the thing produced. <u>See</u> <u>Baltimore City Dep't of Social Servs., v. Bouknight</u>, 493 U.S. 549, 555 (1990). We are thus faced with the issues of whether the Fifth Amendment protects either the contents of Barrett's journal or the communicative aspects of Barrett's actions in producing the journal.[12]

_____

[12]To the extent the Fifth Amendment shielded the journal from compulsory production, that protection was not lost by Barrett transferring the journal to his counsel. "When material has been transferred from a client to an attorney for the purpose of seeking legal advice and the subpoena is directed to the attorney, the proper inquiry is whether the subpoena, if directed to the client himself, would require compelled testimonial self-incrimination." <u>In re Grand Jury Proceedings</u>, 41

-20-

Barrett's argument is premised on the Supreme Court's broad pronouncement that there was no difference between compelling a witness to testify against himself and using a person's private papers against him.  See Boyd v. United States, 116 U.S. 616, 633 (1886).  Boyd's continued vitality has been questioned in later cases.  See, e.g., Bouknight, 493 U.S. at 555 (holding the Fifth Amendment did not shield a mother from producing her infant son);  United States v. Doe, 465 U.S. 605, 612 n.9 (1984) (holding that the Fifth Amendment does not protect the contents of an individual's business records in his own possession);  Andresen v. Maryland, 427 U.S. 463, 477 (1976) (stating any self-incrimination analysis must focus on the voluntariness of the statement at issue); and Fisher, 425 U.S. at 409 (noting that the claim presented in Boyd would now be rejected and stating that the "prohibition against forcing the production of private papers has long been a rule searching for a rationale").

It is now clear, at least with respect to business records, that "if the party asserting the Fifth Amendment privilege has voluntarily compiled the document, no compulsion is present and the contents of the document are not privileged." Doe, 465 U.S. at 612 n.10.  However, whether Doe's rationale extends to purely personal papers in a defendant's possession is still open to some debate.[13]  Compare United States v. Grable, 98 F.3d 251, 253 (6th Cir. 1996); In re Grand Jury Subpoena Duces Tecum, 1 F.3d 87, 93 (2d Cir. 1993); United States v. Wujkowski, 929 F.2d 981, 983 (4th Cir. 1991); In re Sealed Case, 877 F.2d 83, 84 (D.C. Cir. 1989); In re Grand Jury Proceedings, 759 F.2d 1418, 1419 (9th Cir. 1985) (all holding that the Fifth Amendment does not protect the contents of voluntarily prepared documents, whether

_____

F.3d 377, 379 (8th Cir. 1994).

[13]In Fisher, the Supreme Court expressly declined to reach the issue.  See Fisher, 425 U.S. at 414 ("[w]hether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his 'private papers'").

-21-

business or personal) with In re Grand Jury Proceedings, 55 F.3d 1012, 1013-14 (5th Cir. 1995) (per curiam); In re Grand Jury Proceedings, 632 F.2d 1033, 1043 (3d Cir. 1980) (holding that the contents of personal papers remain privileged in certain circumstances).

This court has indicated that if contents of personal papers are protected at all, it is only in rare situations, where compelled disclosure would break the heart of our sense of privacy. See United States v. Mason, 869 F.2d 414, 416 (8th Cir. 1989). Subsequently, we have found that the "the voluntary creation of the subpoenaed documents means that the contents of the documents do not fall under the protection of the Fifth Amendment." In re Grand Jury Proceedings, 41 F.3d 377, 379 (8th Cir. 1994). The act of producing such personal papers, however, and thus requiring a defendant to admit the existence, authenticity, or possession of the documents, can, in some circumstances, result in compelled testimony in violation of the Fifth Amendment. See id. at 380; In re Grand Jury Witnesses, 92 F.3d 710, 712 (8th Cir. 1996). Where the existence, possession, and authenticity of the documents are foregone conclusions, and the defendant would add little or nothing to the government's case by his act of producing the documents, the Fifth Amendment is not violated because nothing he has said or done is deemed to be sufficiently testimonial for purposes of the privilege. See United States v. Rue, 819 F.2d 1488, 1492 (8th Cir. 1987).

Whatever the extent of Fifth Amendment protection for intensely personal and intimate documents in a defendant's possession, Barrett's journal is not entitled to such protection. Under the facts presented in this case, we find that no Fifth Amendment claim can prevail where, as here, there exists "no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused." Couch v. United States, 409 U.S. 322, 336 (1973). Barrett negligently abandoned whatever protections might inure to the contents of the journal as a personal document when he left it for perusal by any prying eyes at the fast food

restaurant.[14]  The contents of the journal became known to law enforcement officers without any compulsion by the government.  Accordingly, we hold that the Fifth Amendment does not protect the contents of Barrett's voluntarily created and negligently disclosed journal.

We further find no violation of the Fifth Amendment in Barrett's compelled production of the journal.  The existence, possession, and authenticity of the journal were already known to law enforcement officers and were foregone conclusions in this case.  Barrett left the journal in the restaurant almost two years before the deaths of Willits and Walker.  It was turned over to the police and copied.  At that time Barrett admitted that he had written the journal.  The police officer to whom he had made the admission identified and authenticated the journal at trial.  Given that the State already had a copy of the journal in its possession and that Barrett had admitted ownership and authorship, there is no support in the record for the conclusion that Barrett incriminated himself through the act of producing the journal.  In sum, Barrett's act of producing the journal "add[ed] little or nothing to the sum total of the Government's information by conceding that he in fact [had] the papers."  Fisher, 425 U.S. at 411.

We reverse the district court's finding that Barrett's Fifth Amendment privilege against self-incrimination was violated by his compelled production of the journal.

_____

[14]A different question might be presented if a personal diary had been kept in a person's secure possession since it had been written and the State attempted to obtain it via a subpoena duces tecum.

### D.    Due Process

After discussing harmless error in Barrett's appeal of his second conviction, the Iowa Supreme Court stated, "[t]his was a second trial. Two juries have unanimously agreed on defendant's guilt." Barrett II, 445 N.W.2d at 754. After noting the fact was "of some significance in evaluating the possibility of prejudice," the court went on to state, "[d]efendant was superbly represented at trial and on appeal. He received a fair, if not absolutely perfect, trial. He is not entitled to a third one." Id. Barrett contends that this statement by the Iowa Supreme Court violated his right to due process. The district court was inclined to agree, but did not reach the issue because it found the issue was procedurally barred.

Although we are inclined, once again, to doubt that the claim was fairly presented to state court, we again decline to rule on the procedural bar issue, since we find that Barrett cannot prevail on the merits. See Lambrix, 117 S. Ct. at 1522. To say that this statement by the Iowa Supreme Court deprived Barrett of constitutional rights borders on the absurd. It is clear that the Iowa Supreme Court relied only on evidence from the second trial. There is no other mention of Barrett's first trial. The comment can be characterized as nothing more than an offhand remark, used to bolster the court's conclusion that Barrett received a fair, if not perfect, second trial. Our review of the record in this case convinces us that the Iowa Supreme Court was correct in that conclusion.

## III.  CONCLUSION

The judgment of the district court granting Barrett's petition for a writ of habeas corpus is reversed and this action is remanded with directions to dismiss Barrett's petition for a writ of habeas corpus.

JOHN R. GIBSON, Circuit Judge, with whom McMILLIAN, Circuit Judge, joins dissenting.

I dissent from the court's holding in Part IIB that the admission of DiMaio's testimony did not violate the Confrontation Clause.

The record demonstrates that Barrett's confrontation claim was fairly presented to the state court and that there was no procedural default. Cross-examination is essential to Barrett's Sixth Amendment right of confrontation. See, e .g., Kentucky v. Stincer, 482 U.S. 730, 736 (1987). Barrett's specific and repeated complaint that DiMaio's testimony was not subject to the test and protections of cross-examination alerted the state court to Barrett's federal constitutional right to confront and cross-examine his accusers. See Morrow v. Wyrick, 646 F.2d 1229, 1232 (8th Cir.), cert. denied, 454 U.S. 899 (1981); Hutchins v. Wainwright, 715 F.2d 512, 518-19 (11th Cir. 1983), cert. denied, 465 U.S. 1071 (1984). The Iowa Supreme Court's ruling that the testimony violated Barrett's right to cross-examination, see State v. Barrett, 445 N.W.2d 749, 754, 758 (Iowa 1989), establishes that Barrett fairly presented the issue to the state court. See Abdullah v. Groose, 75 F.3d 408, 411-12 (8th Cir.) cert. denied, 517 U.S. 1215 (1996). Barrett's Sixth Amendment claim is not procedurally defaulted.

DiMaio's testimony constituted hearsay in violation of Barrett's Sixth Amendment right to confrontation. When the court today reaches the claim of the confrontation clause violation, it engages in what can most charitably be described as a circular analysis. The court first assumes that the Iowa Supreme Court determined DiMaio's answer to be a recitation of hearsay. It then recognizes that in Iowa, hearsay is ordinarily an out-of-court statement offered to prove the truth of the matter asserted. It then concludes that the statement was offered to reveal DiMaio's state of mind which would not be hearsay, and thus raises no confrontation clause concerns. The court's reading of DiMaio's testimony is contrary to that of the Iowa

Supreme Court and the arguments asserted by the Attorney General of Iowa. In order to develop its reasoning, the court dissects DiMaio's statement into three possible meanings, which is two more meanings than have been asserted before either by the Iowa court or the Attorney General. When it must engage in such a creative enterprise it deals a fatal blow to its holding.

The Supreme Court of Iowa in State v. Barrett refers to Barrett's hearsay objection and discusses Iowa cases in which one expert testified that his opinion was confirmed by another expert. 445 N.W.2d 749, 751 (Iowa 1989). The court identified this type of testimony as "indirect or obscured hearsay." Id. The court considered whether Rule 703, which allows an expert to rely on "facts or data" in forming his opinion, allowed an expert to state that other experts also subscribed to the expert's stated conclusions. Id. The court emphasized that Rule 703 did not overrule State v. Judkins, 242 N.W.2d 266 (Iowa 1976), and did not empower one expert witness to state other experts also subscribed to the witness's stated conclusion. Id. It rejected the argument that DiMaio's testimony could be allowed under Rule 703 because there was no foundation testimony showing that the opinion of DiMaio's colleagues was the type of "fact or data" reasonably relied on by similar experts.[15] Id. The court made clear that it "agree[d] with [Barrett's] challenge to the testimony," and that it was "inclined to disapprove" DiMaio's testimony. Id.

When the Iowa court reached the question of prejudicial error, the court again referred to the hearsay evidence rule and considered the defense argument that

---

[15]The court today decides that DiMaio's testimony does not violate the Confrontation Clause because the statement is inherently reliable. The court reaches this conclusion by relying on Rule 703. Nevertheless, the court does not identify the "particularized guarantees of trust-worthiness," or explain the foundation for the testimony. Instead, the court boldly assumes the statement was reliable because DiMaio relied on it, in a seeming "I know it when I see it" approach.

-26-

DiMaio's testimony amounted to testimony that his conclusion was endorsed by his unnamed colleagues, allowing the State, by the challenged testimony, to counter Barrett's array of expert witnesses before the jury without producing their experts for cross-examination. 445 N.W.2d at 754. Further, Justice Lavorato, joined by two other justices in dissent, made abundantly clear that the Iowa Supreme Court's discussion of the issue correctly defined what Iowa courts frequently refer to as the "fighting issue," namely, the shoring up of testimony by soliciting hearsay testimony of the opinions of other experts. Justice Lavorato concluded: "[t]he evil in such a procedure, of course, lay in the defendant's inability to challenge these opinions through cross-examination." Id. at 758.

Thus, it is evident that the Iowa Supreme Court was considering an issue entirely different from the hair split by the court today. The justices of the Iowa Supreme Court, both in the majority and the dissent, found only one meaning springing from the testimony in question. Nevertheless, to reach its conclusion, the court dissects the testimony into two additional slices, neither of which has occurred to anyone dealing with this case in the state courts, or even to counsel appearing before this court. The court simply blinks semantic reality in reaching out for the conclusion it rationalizes today. I think we must consider the testimony as it was considered by the Iowa Supreme Court. DiMaio's answer "no" to the question of whether any of his colleagues had given him persuasive reason to disregard his opinion that Willits's death was a homicide, as opposed to a suicide, carried the evident meaning that other experts, who were not produced for cross-examination, agreed with and bolstered DiMaio's opinion and constituted inadmissible hearsay.

DiMaio's testimony was not harmless. See O'Neal v. McAninch, 513 U.S. 432, 435 (1995). DiMaio's hearsay statement was relevant to perhaps the most crucial issue at trial: whether Willits was murdered, as the State contends, or committed suicide, as Barrett asserts. The statement was made on redirect examination and was obviously intended to bolster DiMaio's opinion that Willits had been murdered. In

effect, DiMaio was telling the jury, "All of my colleagues agree with me that she was murdered." Through these unidentified witnesses--whether two or a dozen--the State presented to the jury evidence damaging to Barrett on a crucial issue and bypassed the constitutional safeguards designed to test the reliability of evidence and bring the truth to light.

Without the opportunity to confront and cross-examine DiMaio's colleagues, Barrett was unable to examine and challenge their theories, assumptions, tests, qualifications, credibility, or any other factor relevant to the weight of this evidence. Barrett was deprived of the "opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Mattox v. United States, 156 U.S. 237, 242-43, 15 S. Ct. 337, 339, 39 L.Ed. 409 (1895).

Of course, we cannot know how much weight the jury assigned to this evidence. But given the importance of this issue to the verdict, the importance of expert testimony to this issue, Barrett's complete lack of opportunity to confront and cross-examine these unidentified accusers, and the State's failure to demonstrate that this evidence had any particularized guarantee of trustworthiness, I conclude that this error was not harmless. I note that both the district court and three dissenting judges of the Supreme Court of Iowa took the view that "such unchallenged opinions on a critical issue served to tip the scales in favor of the State in a case that was obviously close." 445 N.W.2d at 758.

I would hold that the admission of DiMaio's hearsay testimony violated Barrett's Sixth Amendment right of confrontation, and I would grant the writ of habeas corpus.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.