# IN THE COURT OF APPEALS OF IOWA

No. 15-0844
Filed July 27, 2016

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CASEY FREDERIKSEN,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Floyd County, Gregg R. Rosenbladt, Judge.

A defendant appeals his convictions for murder in the first degree and sexual abuse in the first degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**TABOR, Judge.**

A Floyd County jury convicted Casey Frederiksen of murder in the first degree and sexual abuse in the first degree for offenses committed against the five-year-old daughter of his live-in girlfriend. Frederiksen now challenges his convictions on three grounds. First, he disputes the sufficiency of the State's proof that he was the perpetrator. Second, he contends the district court improperly excluded out-of-court statements made by a third party. Third, he argues the court erred in admitting evidence of his possession of child pornography.

Viewing the evidence in the light most favorable to the verdict, we find substantial evidence to identify Frederiksen as the offender. On the evidentiary questions, we conclude exclusion of the out-of-court statements was harmless error and admission of the child pornography was proper. Accordingly, we affirm.

## I.    Facts and Prior Proceedings

In the summer of 2005, E.M. lived with her mom, Noel Miller; Noel's boyfriend, Casey Frederiksen; and her two younger half-brothers. Noel worked nights as a nursing assistant and left the three children in Frederiksen's care. When Noel returned home from work at 6:19 a.m. on July 1, E.M. was missing from the family's apartment. Noel woke Frederiksen who said he thought E.M. was sleeping in her usual spot—on the loveseat in the living room. But she was not there. Noel knocked on the doors of neighboring apartments and called 911 for help in finding her daughter. She also contacted E.M.'s father, Andrew Christie, who was scheduled to pick up their daughter that morning for his holiday weekend visitation.

Noel was "frantic" by the time Floyd County Sheriff's Deputy Brian Tiedemann arrived at the Quarry Road Apartments.[1] Investigators detected less desperation in Frederiksen's demeanor, describing him as "matter of fact" and disinterested in the progress of the search. Although Frederiksen was interested in the investigators' conversations, so much so that Deputy Tiedemann had to tell him three times not to eavesdrop on them. When the deputy suggested to Frederiksen that he might be a suspect in E.M.'s disappearance, Frederiksen did not say anything but dropped his gaze from the deputy's chest to his toes. Andrew, who came to join the search for his daughter, recalled Frederiksen cycling between "calm and collected" in the morning, to losing his temper in the afternoon, to regaining his calm by evening.

When deputies asked for a recent photograph of E.M. to aid in the search, Frederiksen did not accommodate the request, saying the photographs were stored on his computer but it was not working. Frederiksen also told deputies the family's only operable vehicle was a Chrysler they borrowed from his father and Noel drove it to work that night.

Hundreds of volunteers gathered to help comb the area for clues to E.M.'s disappearance. Among them was Noel's friend and downstairs neighbor, Tanya Martinez, who called Danny Slick, the father of Tanya's youngest child, to see if he could babysit while she joined the search. When Slick heard E.M. was missing, he told Martinez that he and Randy Patrie had seen the girl that morning between 2:00 and 3:00 when they stopped by the Quarry Road Apartments to

---

[1] The brick building, located off Highway 18/27 a few miles north of Charles City, had been the Floyd County Home but was converted into apartments.

drink beer with Frederiksen. According to Slick, he and Patrie picked up a twelve pack at the convenience store, drove by their friend's apartment, saw the glow from the television, and knocked on the door to see if Frederiksen wanted to socialize. E.M. came to the door dressed in a tank top and shorts but looking drowsy. Slick asked her "if Casey was up" and "she said no," he was in his bedroom. Slick told the girl: "I guess I won't wake him up then, you should probably get going back to bed." Slick testified he and Patrie "turned around and left"—returning to the rented rooms they shared at a house in Charles City.

Slick spoke candidly with investigators about seeing E.M. in the early morning hours, but he initially lied to them about Patrie's subsequent actions. Slick first told investigators Patrie went to his sister's house around 3:00 a.m. but returned ten to fifteen minutes later. In reality, Slick did not know where Patrie went or when he returned. Slick also had noticed Patrie used the burn barrel in the backyard of the house where they lived on July 2, 2005. The police seized strips of burned cloth consistent with t-shirt material from the barrel.

While the search for E.M. continued into the Fourth of July weekend, Frederiksen traveled with a friend to Des Moines and Waterloo to purchase marijuana.

On July 6, 2005, two kayakers searching for E.M. found her body caught on a branch at a bend in the Cedar River called Devil's Elbow. Locals familiar with the river testified "you can't get to [Devil's Elbow] without a boat"—so investigators believed the perpetrator likely dumped E.M.'s body from a more accessible location upstream. One such accessible location was Doug Kamm's property, where a lane connects Highway 27 with access to the river.

The body discovered in the river was clothed in a tank top and shorts, but the medical examiner, Dr. Jerri McLemore, testified E.M.'s underwear was inside out. An autopsy revealed E.M. died from "sharp force injuries" to her head, neck, chest, and right arm. Despite the body's decomposition, Dr. McLemore could see bruising on E.M.'s left hand, ankles, and inner thighs. The medical examiner testified that in the hours before her death, E.M. suffered deep lacerations to the tissue of the vagina and to the perineum between the vagina and the anus, as well as bruising to the labia majora on each side of the vagina. The medical examiner believed the genital injuries could have been caused by an erect male penis. According to Dr. McLemore, the injuries would have caused bleeding and pain.

The discovery of E.M.'s body prompted investigators from Floyd County, the Iowa Division of Criminal Investigation (DCI), and the Federal Bureau of Investigation (FBI) to find her killer. Those efforts included the use of tracking dogs. On July 8, 2005, the FBI brought in two bloodhouds, Tinkerbelle and Lucy, to help with the murder investigation. In a child-abduction case, the canine manager acquires "scent articles"—items that carry the odor of the victim and items that carry the odor of potential offenders. The manager then uses a low airflow vacuum to transfer the person's scent from the article to a sterile gauze pad. The bloodhounds use the "scent pad" to form an association between the personal article and the locations where that person may have been taken. The canine manager keeps the dog handlers "blind to the case" to eliminate potential claims of bias.

Tinkerbelle and Lucy gave positive responses for both E.M.'s scent and Frederiksen's scent at Kamm's property along the Cedar River. The FBI dogs did not link Patrie's scent to Kamm's property. Another bloodhound, Tasha, brought by private handler Lynn Gardiner of People & Paws, also alerted to E.M.'s scent at Kamm's property on July 19, 2005. Gardiner recalled Tasha "took off like a rocket" from that property to the riverbank. Tasha also had an "extreme" response to a fire pit area in a clearing near the river on Kamm's property. Because the dog "was howling like crazy, jumping on the back of her feet like a kangaroo," Gardiner believed she had found a "crime scene."[2] A cadaver dog also gave a positive indication at that location. But investigators were not able to recover any forensic evidence from the fire-pit area. Lab workers testified the bacteria found in dirt is destructive to DNA.

On July 11, 2005, Frederiksen spoke with law enforcement while under oath at the Floyd County courthouse. He said E.M. was asleep in the living room when Noel left for work and he saw her still asleep on the loveseat about 1:45 a.m. when he gave his one- and two-year-old sons new bottles and changed their diapers. Frederiksen said he did not hear anything else until Noel woke him up the next morning.

As the focus of the investigation moved away from the Quarry Road Apartments, law enforcement packed up and left that location in mid-July of 2005. At that time, Frederiksen and Noel showed up at Martinez's apartment with a couple of garbage bags full of personal items, asking if she would "keep

---

[2] Tasha also trailed E.M.'s scent northbound from the Quarry Road Apartments toward the town of Floyd.

some of their stuff" at her place. Frederiksen told Martinez his computer hard drive was in one of the bags, containing "the only pictures they had left of [E.M.] and they didn't want the DCI . . . to snatch them up . . . otherwise they would have no pictures of [E.M.] left." Later in the summer of 2005, Martinez turned the hard drive over to the Floyd County Sheriff.

A DCI agent specializing in computer forensics concluded the hard drive belonged to Frederiksen because it contained his emails. As Frederiksen told Martinez, the hard drive contained photographs of E.M. But it also contained multiple images and videos of children between the ages of four and seven engaged in sex acts. The forensic review showed a user named "Casey" had last logged onto the computer on July 11, 2005, the same day as Frederiksen's courthouse interview.

Frederiksen was convicted on federal charges of possessing child pornography and sentenced to federal prison in 2006. While incarcerated, Frederiksen was interviewed by FBI Special Agent Randy Van Gent in January 2007. Agent Van Gent asked Frederiksen why he thought E.M. had been put into the river. Frederiksen said he was not sure but "possibly it could have been some sort of sexual thing." At that point in time, it was not public knowledge that E.M. had been sexually assaulted. The agent also told Frederiksen the bloodhouds had detected his scent at Kamm's property along the Cedar River. Frederiksen suggested E.M. may have taken his winter coat from the apartment on the July night when she was abducted.

Frederiksen's version of events changed dramatically in a February 2007 prison interview with FBI Agent Jennifer Sullivan. Frederiksen, for the first time,

recounted that on July 1, 2005, he heard somebody rattling the door at 3:00 a.m. and then saw Patrie standing behind the loveseat with a knife to E.M.'s neck. Frederiksen claimed Patrie told him: "I'm taking [E.M.], I'll bring her back, and if you get in the way or if you try to stop me, I'll kill you and your boys." Frederiksen said he did not previously bring this information to law enforcement's attention because "he was afraid Noel would be mad at him for not stopping Patrie from taking her baby."[3]

In the same February 2007 interview, Frederiksen denied having sexual contact with E.M. But Frederiksen stated when E.M. was a baby and "he was changing her diapers, he became sexually aroused and didn't act on it." Frederiksen also told Agent Sullivan that "he thought he was a sicko" for being aroused by child pornography. During a second interview with Agent Sullivan in March 2007, Frederiksen said his weakness was "watching grown men sexually abuse girls between the ages of five to seven." He admitted masturbating while watching such sexual abuse, and he told the agent, "[I]n fact on that night that [E.M.] disappeared he was masturbating to child pornography while she was asleep about fifteen feet away from him." But he again denied having sexual contact with E.M.

Frederiksen allegedly admitted sexual contact with E.M. in conversations with fellow federal inmate Richard Carter. Carter befriended Frederiksen when they were housed in the same unit at the Marion Correctional Center in Illinois. According to Carter, Frederiksen revealed he had "fingered" E.M.'s genitalia

---

[3] Frederiksen later told his sister that he lied when he told investigators that Patrie removed E.M. from the apartment at knifepoint. In fact, his sister testified that in a July 2007 conversation Frederiksen told her several different versions of what happened.

under her dress when she was two-and-one-half years old. Carter also testified Frederiksen admitted having oral sex with E.M. and forcing contact between his penis and her vagina, which E.M. said "hurt." Frederiksen told Carter he had been sexually assaulting E.M. "up until her death." Carter also testified Frederiksen blamed Patrie for E.M.'s abduction. Frederiksen told Carter that E.M. had been sexually assaulted and stabbed multiple times. Carter testified he had not received information from anyone outside of prison about E.M.'s murder.

In 2009, investigators staged an experiment to retrace the murderer's steps from the Quarry Road Apartments to the river-assessable portion of Kamm's property—a distance of 1.3 miles as the crow flies. Three different deputies—of varying heights and weights—set out on foot, taking different routes, but each carrying a forty-five pound weight to simulate the heft of E.M.'s body. All three made the round trip in less than two hours.

More than seven years after the killing, on October 24, 2012, the Floyd County Attorney filed a trial information charging Frederiksen with two class "A" felonies: first-degree murder, in violation of Iowa Code sections 707.1, 707.2(1), and 707.2(2) (2005), and first-degree sexual assault, in violation of sections 709.1 and 709.2.

On a change of venue to Hamilton County, a jury trial commenced on March 2, 2015. At trial, the State summarized its theory of the case as follows:

> Why would Casey Frederiksen kill a five-year-old defenseless kid, why would he do that? Somebody that he supposedly loves and cares for. Well, he's sexually attracted to her. The injury that she received—the genital injury she received— Doctor McLemore will testify would have happened within about 24 hours . . . . And Andy Christie is supposed to pick her up on July 1 of 2005. He cannot let [E.M.] go with Andy Christie with those

types of injuries. And his answer was to kill her. The motive for this case is sexual and in all of the evidence in this case points to Casey Frederiksen.

The jury found Frederiksen guilty as charged on both counts. The district court imposed consecutive life sentences without the possibility of parole. Frederiksen now appeals.

## II.    Scope and Standards of Review

In deciding if the State presented sufficient evidence that Frederiksen was the person who sexually abused and killed E.M., we review the district court's ruling on his motion for judgment of acquittal for the correction of legal error. *See State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). "We consider all of the record evidence in the light most favorable to the State." *Id.*   Our review takes into account both inculpatory and exculpatory evidence. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

We likewise review the district court's grant of the State's motion in limine concerning hearsay evidence for the correction of legal error. *See State v. Newell*, 710 N.W.2d 6, 18 (Iowa 2006). Subject to relevance requirements, the district court lacks discretion to deny a party's request to offer an out-of-court statement that fits within an exemption or exception, or to allow it into evidence without a rule prescribing its admission. *Id.*

We review the admission of bad-acts evidence for abuse of discretion. *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014). "A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Long*, 814 N.W.2d 572, 576 (Iowa 2012) (citation omitted). "A ground or reason is untenable when it is not

supported by substantial evidence or when it is based on an erroneous application of the law." *In re Det. of Stenzel*, 827 N.W.2d 690, 698 (Iowa 2013) (citation omitted).

## III. Analysis

### A. Sufficiency of the Evidence

This case is a whodunit. The only element of the crimes contested by Frederiksen is his identity as the perpetrator. Frederiksen argues that even after ten years of investigation, the State offered "only weak circumstantial evidence" that he was the person who sexually assaulted and murdered E.M. On appeal, he attacks several aspects of the prosecution, including (1) his limited window of opportunity to commit the crimes, (2) the reliability of the bloodhound evidence, (3) the credibility of fellow inmate Carter, and (4) the probative value of Frederiksen's admissions to being sexually aroused by E.M. and to having masturbated while viewing child pornography the night of her disappearance.

Frederiksen's appellate arguments would be better directed at jurors who are charged with judging credibility and deciding the weight to give certain evidence. *See State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984) ("[T]he jury is at liberty to believe or disbelieve the testimony of witnesses as it chooses and give such weight to the evidence as in its judgment the evidence was entitled to receive." (citation omitted)). When viewed in its totality, we find the State's evidence was sufficient for a reasonable jury to determine beyond a reasonable doubt that Frederiksen sexually assaulted and murdered E.M.

On the issue of opportunity, the evidence showed E.M. was murdered between approximately 2:30 a.m. (when she was seen by Slick and Patrie) and

6:19 a.m. (when Noel returned home to find her missing). This nearly four-hour window of time would have been sufficient for Frederiksen to carry out the dastardly acts. He had ready access to E.M., who was left in his sole care. Investigators established that even if Frederiksen did not have access to an operable car, he would have been able to travel on foot to the river carrying E.M. and back to the apartment by the time Noel returned from work.

As to the reliability of the tracking dogs, Frederiksen does not urge on appeal that the evidence of their use of scent to signal the presence of the perpetrator and the victim at certain locations was too uncertain to be admissible. *See, e.g.*, *State v. Buller*, 517 N.W.2d 711, 714 (Iowa 1994) (upholding admissibility of expert testimony from dog handler concerning reaction at fire scene of dog trained in accelerant detection); *see also State v. White*, 676 S.E.2d 684, 687 (S.C. 2009) (commending court of appeals "for its thorough analysis of our country's jurisprudence concerning dog tracking evidence" and for recognizing "an overwhelming number [of jurisdictions] allow admission of dog tracking evidence in a criminal case to prove identity"). Instead, he argues "it should not be used as the primary evidence in a case." Without taking a position on the point whether testimony concerning dog tracking may serve as the "primary" evidence in a case, we find the use of such evidence here contributed to the sufficiency of the State's proof that Frederiksen took E.M. to the river to dump her body. The defense pointed out the weaknesses of the scent detection on cross-examination of the State's witnesses, and the jury was free to assign the appropriate weight to that evidence.

As for Carter's credibility, the jurors knew he was serving a federal sentence for possession of child pornography, along with Frederiksen. Defense counsel highlighted the potential for bias on cross-examination. But some circumstances bolstered the believability of Carter's testimony concerning conversations with Frederiksen. For instance, Carter had no exposure to the facts of E.M.'s abduction and murder independent of what he learned from Frederiksen. Jurors were entitled to credit none, parts, or all of Carter's testimony. *See State v. Arne*, 579 N.W.2d 326, 328 (Iowa 1998) ("The credibility of witnesses, in particular, is for the jury."); *see also State v. Johnson*, 152 N.W.2d 426, 432-33 (Iowa 1967) (upholding conviction where jury "saw and heard the witness" who was an inmate).

On the issue of Frederiksen's sexual attraction to E.M. and young girls in general, we find that evidence also contributed to the sufficiency of the State's evidence that he was the perpetrator. Frederiksen took pains to hide his computer hard drive from investigators, which points to his guilty knowledge. Moreover, the State presented the jury with the plausible theory that Frederiksen acted on his sexual arousal, causing significant and painful injuries to the five-year-old girl's vagina and anus. The State theorized, because Frederiksen knew he could not send E.M. on a weekend visitation with her father in that condition, he fatally stabbed her to secure her silence before dumping her body in the river to wash away any DNA evidence.

In addition, Frederiksen's changing stories add to the strength of the State's case against him. *See Blair*, 347 N.W.2d at 422 (holding "a defendant's inconsistent statements are probative circumstantial evidence from which the jury

may infer guilt"). Frederiksen told investigators various versions of what happened at the Quarry Road Apartments the night of E.M.'s disappearance, eventually claiming (1) he allowed Patrie to kidnap the girl at knifepoint, but (2) he had not told investigators because he was afraid of Noel's reaction. Thereafter, Frederiksen admitted to his sister that he had fabricated the new story to authorities about a knife abduction. The jury was entitled to infer guilty knowledge from Frederiksen's own shifting statements.

Finally, the defense attempts to deflect blame from Frederiksen to Randy Patrie, one of the last people to see E.M. alive. But a reasonable jury could have rejected the defense suggestion that Patrie was a more likely suspect. Patrie was not found in possession of child pornography. The bloodhounds did not trace Patrie's scent to the crime scene. The DCI collected samples and tested more than a dozen swabs from Patrie's car and residence and did not find any evidence linking him to E.M. Plus, Frederiksen's retracted claim that Patrie abducted E.M. by knifepoint supports the notion that Frederiksen sought to implicate Patrie only as a means of exculpating himself.

After viewing the evidence against Frederiksen in its entirety and in the light most favorable to the State, we decline to disturb the jury's verdict.

**B. Hearsay**

Frederiksen's next challenge is to the district court's exclusion of out-of-court statements attributed to Patrie. The State filed a motion in limine seeking to prohibit the defense from "[a]sking any witness to testify concerning Randy Patrie's statements as said statements would be hearsay and/or assuming facts not in evidence." In its motion, the State cited *State v. Elliott*, 806 N.W.2d 660,

669 (Iowa 2011), for the distinction between "an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation."

Frederiksen asked the district court to allow the statements into evidence on the basis they were not offered for the truth of the matter asserted but rather to show Patrie's deception. The defense outlined five statements at issue:

- In the first statement, Patrie told a DCI agent that he returned to his house at 2:45 a.m. on July 1, 2005, and "slipped into bed." According to the defense, Patrie admitted in a later interview he did not go to bed at that time.

- In the second and third statements, Patrie told DCI agents in two separate interviews that on the night in question he was wearing a white t-shirt with a dragon design on the front, but a surveillance video from the convenience store shows he was wearing a plain white t-shirt. The defense proffered: "Ultimately that would tie to the burn barrel argument that obviously we'll have that [Patrie] was destroying evidence."

- In the fourth statement, Patrie told FBI Agent Van Gent that it was Slick who came up with the "false alibi" for Patrie and Patrie was "just following [Slick's] lead."

- The fifth statement is from a DCI report providing, on July 1, 2005, Patrie said to a special agent and Slick that "this is terrible or tragic, something to that effect" just after E.M. was determined to be missing and before anyone knew if "she was going to be missing even the remainder of that day or the remainder of the morning." The defense argued the statement pointed to Patrie's guilty conscience.

In excluding these statements, the district court sided with the State, offering the following analysis:

> The hearsay rule says that if [statements are] offered for a purpose other than establishing the truth of the matter asserted, then they are not hearsay. The State has countered that there are also nonhearsay purposes for this information coming in, and the court is concerned that the jury, in fact, may use this evidence for the nonhearsay purposes and actually consider the statements for the truth of the statements asserted, the truth of the matter asserted, and so I think this comment to the rules of evidence is very relevant and I've got to consider all possible purposes and impacts of the evidence offered.

The court relied on *Elliott* for the proposition that the substance of the out-of-court statements must be considered when determining admissibility. 806 N.W.2d at 668. The court ruled: "We have to realize that Mr. Patrie's not here, he's not testifying, he's not been sworn, and these statements are not under oath and they may be viewed as going to the facts or the truth of the matter asserted."

On appeal, Frederiksen renews his contention that the five statements were not hearsay under Iowa Rule of Evidence 5.801 and, therefore, were admissible. The State contends the statements were properly excluded and points to the doctrine of implied assertion, contending rule 5.801 applies to both the "literal truth of a statement, as well as any implied truth or assertions." *See State v. Dullard*, 668 N.W.2d 585, 594-95 (Iowa 2003).

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(c). "To determine if an alleged hearsay statement is admissible, we must analyze the purposes for which it was offered." *Elliott*, 806 N.W.2d at 668. In analyzing Patrie's statements, "we look 'at the *real*

purpose for the offered testimony'" not just the purpose urged by the proponent of the evidence. *See id.* (citation omitted).

### (1) Statements Offered to Prove Falsity

Frederiksen argues the purpose of offering the first four statements at issue was to "point out their falsity." The State counters:

> This is precisely what the hearsay rule disallows. "Where the [relevant] inference depends on the truth of the explicit assertion, admissibility of the inference as nonhearsay would deny the opponent the opportunity to cross-examine the declarant's perception, recall, communication and lack of sincerity with respect to the explicit assertion from which the inference is derived."

(quoting Laurie Kratky Doré, 7 Iowa Practice Series, Evidence § 5.801:5 (2015)) [hereinafter Evidence § 5.801:5].

Iowa courts have held that a statement admitted without reference to its truth or falsity is not hearsay. *State v. Hilleshiem,* 305 N.W.2d 710, 712 (Iowa 1981) (upholding admission of statements of one party to a conversation to show context in which admissible statements by another party were made). But the question here is whether a statement offered to prove the falsity of the matter asserted is hearsay. Some jurisdictions have decided statements offered to prove the falsity of the matter asserted are not hearsay. *See, e.g.*, *United States v. Hathaway*, 798 F.2d 902, 905 (6th Cir. 1986); *United States v. Pedroza*, 750 F.2d 187, 203 (2d Cir. 1984); *United States v. McDonnel*, 550 F.2d 1010, 1012 (5th Cir. 1977); *State v. Robinson*, 715 N.W.2d 531, 560 (Neb. 2006). Our court has upheld the admission of testimony used to show a defendant is not telling the truth, finding such evidence was "relevant and material on the theory that consciousness of guilt may be inferred from the attempted evasion, palpable

falsehood, or suppression of the true facts by one suspected of crime." *State v. Crowley*, 309 N.W.2d 523, 524 (Iowa Ct. App. 1981) (rejecting defendant's claim that his declaration was not admission by party opponent because it was exculpatory).

Assuming, without deciding, Patrie's allegedly false out-of-court statements were admissible, any error in excluding them was harmless. *See Newell*, 710 N.W.2d at 19 (analyzing hearsay ruling under nonconstitutional harmless-error standard). In cases of nonconstitutional error, we ask: "[D]oes it sufficiently appear the rights of the complaining party have been injuriously affected by the error [so] that he has suffered a miscarriage of justice?" *State v. Trudo*, 253 N.W.2d 101, 107 (Iowa 1977). "Error may not be predicated upon a ruling [that] admits or excludes evidence unless a substantial right of the party is affected." Iowa R. Evid. 5.103(a).

Frederiksen argues he was prejudiced by the district court's exclusion of statements made by Patrie. He contends the statements reflect Patrie's deception and awareness of facts not known by the general public. Frederiksen further asserts showing Patrie's deception was crucial to establishing his defense.

In response, the State points out that the district court allowed Frederiksen numerous opportunities to put forward this theory of defense using other strategies.[4] The court allowed defense counsel to ask if certain statements were

---

[4] The State alternatively asserts Frederiksen could have called Patrie to the stand and asked him about these statements. Frederiksen argues he may have been prohibited from calling Patrie under *State v. Turecek*, 456 N.W.2d 219, 225 (Iowa 1990) (holding the State could not place a witness on the stand who was expected to give unfavorable

made, "without getting into specific statements." For instance, defense counsel asked DCI Agent Chris Calloway about his interview with Patrie, specifically addressing the time frame and t-shirt issues. Defense counsel further asked if anyone in the investigation was able to "confirm Mr. Patrie's whereabouts after he dropped Dan Slick off" on the night of the murder. We agree with the State that allowing these inquiries served essentially the same purpose as admitting Patrie's out-of-court statements.

Moreover, as discussed above, the State presented strong evidence showing Frederiksen's motive and opportunity to commit the sexual assault and murder. *See Newell*, 710 N.W.2d at 25 (considering overall strength of prosecution's case in assessing whether error was harmless). No similar evidence linked Patrie to the crimes. Therefore, even if the district court improperly excluded Patrie's statements under the hearsay rule, their exclusion was harmless error.

### (2) Statements Based on Implied Truth or Implied Assertion

Fredericksen argues he should have been allowed to offer the fifth statement, Patrie's comment on the "tragic" or "terrible" nature of E.M.'s disappearance, to show Patrie had a knowledge or awareness of the facts of E.M.'s death before she was discovered, supporting Patrie's potential role as a suspect. The State counters that the statement was properly excluded because it was offered to imply Patrie's knowledge of E.M.'s fate before it was known she had come to any harm.

---

testimony and then, in the guise of impeachment, offer otherwise inadmissible evidence). We do not find it necessary to resolve the question of Patrie's availability as a defense witness.

The doctrine of implied assertion applies both to the literal truth of a statement as well as any implied truth or implied assertions. *Dullard*, 668 N.W.2d at 595-96 (holding a handwritten note to Dullard indicating the author was nervous and police were watching constituted an implied assertion that Dullard possessed drug materials, and because it was assertive speech, it was inadmissible under the hearsay definition). The implied truth of Patrie's statement is that he knew more about the crime than others—which the defense wished to use to divert attention from Frederiksen. Allowing inferences that depend on the truth of the explicit assertion denies opposing counsel the opportunity to cross-examine, which is what the hearsay rule disallows. Evidence § 5.801:5. We conclude the district court properly excluded Patrie's statement about the tragic nature of E.M.'s disappearance under the doctrine of implied assertion. But even if the district court wrongly excluded this statement as inadmissible hearsay, like Patrie's other out-of-court statements discussed above, its exclusion was harmless error.

## C.    Prior Bad Acts

Frederiksen's final issue involves the district court's admission of evidence that he possessed and viewed images of child pornography. Frederiksen filed a motion in limine seeking to exclude "any evidence that [he] had child pornography on his computer," arguing it "goes to propensity, is irrelevant and more prejudicial than probative."

In ruling on the defense motion, the district court noted that during the investigation of E.M.'s murder authorities discovered Frederiksen possessed child pornography on his computer's hard drive; he entered a guilty plea to

federal possession charges, and while awaiting trial in this matter, he was serving his federal sentence. The court explained the State was "proposing to use extremely limited testimony regarding the child pornography and the 'strikingly similar' nature of the evidence (videos of adult males abusing children approximately the same age as E.M. and a photo of a girl bearing a striking resemblance to E.M.)." The district court decided the evidence of Frederiksen's possession of child pornography was admissible to prove his identity as the perpetrator of the sexual assault and murder.

On appeal, Frederiksen argues the evidence should have been excluded under Iowa Rule of Evidence 5.404 because it was used to prove character, not identity. He further contends the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Iowa R. Evid. 5.403.

To counter, the State asserts the evidence was critical to its ability to establish Frederiksen was the perpetrator, making it more probative than prejudicial. The State additionally argues that because the district court accepted the State's proposal to limit the scope of the evidence presented to the jury, as was the case in *Putman*, the evidence was not unfairly prejudicial. *See* 848 N.W.2d at 12. We agree with the State that *Putman* provides a strong framework for the case at hand, as the similarity between the cases cannot be ignored. *See id.* ("The district court, however, winnowed out this mass of child pornography evidence, leaving only the evidence of child pornography bearing a striking similarity to the crime for which Putman was on trial.").

*Putman* examined Iowa Rule of Evidence 5.404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Courts recognize bad-acts evidence can cause unfair prejudice and caution that "a defendant must be tried for what he did, not for who he is." *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir. 1977). Iowa courts have long excluded bad-acts evidence offered only "to illustrate the character of the accused for purposes of establishing other actions in conformity with that character." *State v. Barrett*, 401 N.W.2d 184, 187 (Iowa 1987). Our supreme court has held, if the State proffers bad-acts evidence, it must articulate a valid, noncharacter theory of admissibility. *State v. Sullivan*, 679 N.W.2d 19, 28 (Iowa 2004). Here, the State offered the challenged evidence to prove the identity of the perpetrator.

After determining the State has asserted a noncharacter theory of relevance, the court then determines whether to admit the evidence by using a three-step analysis. *Putman*, 848 N.W.2d at 8. First, the court decides if the evidence is relevant to a legitimate, disputed fact. *Id.* at 9. Second, the court asks if clear proof exists that the defendant actually committed the bad acts. *Id.* Third, the court must assess whether its "probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *Sullivan*, 679 N.W.2d at 25. We will consider each step.

**(1)** *Relevance.* Evidence is relevant if it makes "the existence of a fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence." Iowa R. Evid. 5.401. Where the State presents bad-acts evidence for the purpose of proving identity, we apply a more demanding test than general relevancy. *State v. Butler*, 415 N.W.2d 634, 635-36 (Iowa 1987). To permit a fact finder to infer that similar acts establish the same person committed both, the other acts must be "strikingly similar" or of a "unique nature." *In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005). In *Putman*, the supreme court found the district court did not abuse its discretion in admitting evidence the defendant possessed specific videos involving sexual abuse because the evidence was "strikingly similar" to the nature of the crime. 848 N.W.2d at 16.

Frederiksen argues evidence of his possession of child pornography was not relevant in his trial for murder and sexual abuse because the State only presented testimony regarding a small portion of the explicit images located on his computer's hard drive, thus skewing the prior bad acts to appear more similar to the acts at issue. At oral argument, defense counsel tried to distinguish *Putman* by emphasizing the "unique nature" of the child pornography offered there, specifically the titles of videos referencing rapes of two-year-old girls, when Putman was on trial for sexually assaulting a girl of the same age. Counsel asserts, unfortunately, Frederiksen's general preoccupation with child pornography is not "particularly unique." We are not persuaded by the distinction. The relevance test for proving identity requires proof that the other acts are "strikingly similar" *or* of a "unique nature." *See J.A.L.*, 694 N.W.2d at 753. The proponent of the evidence is not required to show both a striking similarity *and* uniqueness.

Following the precedent set by *Putman*, the district court did not err in allowing the State to present testimony regarding a limited selection of the images found on Frederiksen's hard drive. In this case, Michael Morris, a DCI computer forensics investigator, testified that he discovered multiple images and videos on the hard drive depicting children between the ages of four and seven engaged in explicit sexual conduct. E.M. was five, almost six, years old when she was sexually abused and killed. FBI Agent Sullivan testified (1) Frederiksen admitted to viewing pornography of adult males sexually abusing girls between the ages of five to seven and (2) Frederiksen admitted to masturbating to pornography the night of E.M.'s disappearance. The nature of the child pornography that Frederiksen possessed and viewed on his computer was strikingly similar to the acts perpetrated against E.M., in the same way the video titles discussed in *Putman* were strikingly similar to the acts perpetrated in that case. *See* 848 N.W.2d at 12-13 (discussing "undeniable similarity" between content of videos and defendant's act of abusing girl of similar age). Accordingly, Frederiksen's possession of the images makes it more probable he was the person who abused E.M.

**(2)** ***Clear Proof***. Frederiksen concedes there was clear proof he possessed the child pornography located on his computer's hard drive.

**(3)** ***Probative Value versus Unfair Prejudice***. When comparing the challenged evidence's unfair prejudice and probative value, the court looks to a series of factors, including the need for the evidence when considering the issues and other available evidence, the strength or weakness of existing evidence on

the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper bias. *Id.* at 9-10.

Here, the State argues it needed the testimony regarding Frederiksen's possession of child pornography to establish the identity of the perpetrator due to the lack of other forensic evidence and the victim's inability to testify. Additionally, as Frederiksen's defense involved implicating another suspect, the State needed to counter that accusation. Given these circumstances, the probative value of the evidence was significant. *See id.* at 14 (finding probative value of defendant's possession of child pornography was "substantially increased" because the prosecution needed to respond to defense's assertion someone else was abuser).

Our final task is to determine whether the district court abused its discretion in deciding the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Iowa R. Evid. 5.403. We acknowledge the type of evidence at issue "has a strong tendency to produce intense disgust." *See Putman*, 848 N.W.2d at 14-15. But as in *Putman*, the district court here was mindful of the prejudicial nature of the evidence and required the State to "winnow" a large stash of child pornography into testimony regarding the most relevant images and videos. *See id.* at 16. Additionally, the risk of prejudice was mitigated by the court's limiting instruction advising the jury to consider the child-pornography evidence only in determining identity. Because the district court limited the State's use of the disputed evidence and for all the reasons stated above, we find no abuse of discretion.

**IV.    Conclusion**

After viewing the evidence in its entirety and in the light most favorable to the State, we find sufficient proof to sustain Frederiksen's convictions for first-degree murder and first-degree sexual assault.  We further conclude, even if the district court improperly excluded Patrie's out-of-court statements, the exclusion was harmless error.  Finally, we find no abuse of discretion in the court's decision to admit testimony that Frederiksen possessed child pornography given the "strikingly similar" nature of the evidence and his crime of child sexual abuse.

**AFFIRMED.**